IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-03092-MSK-KLM

LOUISVILLE HOSPITALITY GROUP, INC.

        Plaintiff,

    v.

SUTHERLAND ASSET I, LLC and
KEYCORP,

        Defendants.

---

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

---

Plaintiff Louisville Hospitality Group, Inc. ("LHG"), by and through its undersigned counsel, hereby respectfully alleges and states its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57; and Tex. Civ. Prac. & Rem. Code §§ 37.001, et seq., as follows:

## <u>INTRODUCTION</u>

1.      This declaratory judgment action seeks the Court's determination as to the parties' rights and obligations under a 20-year Promissory Note for a construction loan executed on January 20, 1999 and set to mature on January 20, 2019.  Although LHG has been making the same accepted monthly payments under the Promissory Note for nearly 20 years, Defendant Sutherland Asset I, LLC ("Sutherland") recently threatened litigation through its loan servicer if LHG does not agree to pay a $541,927.84 balloon payment, make increased monthly payments, or extend the maturity date under the Promissory Note.  This action presents a justiciable controversy perfectly suited for this

Court to efficiently declare the parties' rights and obligations prior to the January 20, 2019 maturity date and the forthcoming balloon payment demand. LHG respectfully seeks a declaration that (1) the original interest rate under the Promissory Note was never permissibly increased; that (2) even if the interest rate was permissibly increased, the right to demand a balloon payment, increased monthly payments, or an extended maturity date was irrevocably waived through inconsistent actions and communications over many years; and, therefore, (3) that the current amortization schedule and monthly payment amount under the Promissory Note should remain the same, and that the Defendants have no right to demand a balloon payment, increased monthly payments, an extended maturity date, or any other relief.

## PARTIES

2.      LHG is a Colorado corporation with its principal place of business in Louisville, Colorado. LHG owns and operates the hotel doing business as Best Western Plus Louisville Inn & Suites located at 960 W. Dillon Road, Louisville, Colorado 80027 (the "Property"), and is the borrower under the Promissory Note at issue.

3.      Sutherland is a Delaware limited liability company with its principal place of business in New York City, New York. Sutherland purchases or otherwise acquires mortgages and other liens on real estate in various locations across the country, and owns the Promissory Note at issue. Sutherland's sole member is Sutherland Asset Management Corporation, a Maryland corporation with its principal place of business in New York City, New York.

4.      KeyCorp is an Ohio corporation with its principal place of business in Cleveland, Ohio.  KeyCorp, among other things, acts as a commercial real estate loan servicer for Sutherland through its KeyBank Real Estate Capital business unit.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal statutes 28 U.S.C. §§ 2201–2202.  This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) because LHG and the Defendants (including Sutherland's sole member) are citizens of different states, and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over LHG's state law claim pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the only real property at issue in this action is situated in this district and because a substantial part of the events and omissions giving rise to LHG's claims occurred in this district, including, but not limited to, the negotiation and execution of the loan instruments by LHG, the regular receipt of documents relating to the loan and subject property by LHG and individuals residing in this district, and the occurrence of other communications regarding the loan and subject property with LHG and individuals residing in this district.

## FACTUAL ALLEGATIONS

7.      LHG, as borrower, executed a Construction Loan Agreement with original lender PMC Commercial Trust ("PMC") on January 20, 1999 for the construction of the hotel on the Property. *See* Attachment A.

8.      On the same day, LHG and PMC executed a 20-year Promissory Note secured by a mortgage on the Property in the original principal amount of $2,174,000.00 (the "Note"). *See* Attachment B.

9.      The interest rate expressly established under the Note was 9.00% per annum (the "Interest Rate"). *Id.* at 1.

10.     Other than an event of default, the only permissible basis for an increase to the Interest Rate rate is if "the proceeds of this Note are not fully funded on or before the Completion Date (as defined in that certain Construction Loan Agreement of even date herewith . . . .)" *Id.* If this event occurred, PMC could adjust the Interest Rate "to the rate charged on such date by [PMC] for similar type loans . . . ." *Id.*

11.     The Construction Loan Agreement defines "Completion Date" as "the date set forth on Exhibit 'D' attached hereto," but Exhibit D does not set forth a date and instead only provides an ambiguous reference to "240 Calendar Days." *See* Attachment A at 2, ¶ 1.10; and 29, Exhibit D. 240 calendar days from the January 20, 1999 execution date should set the Completion Date as September 17, 1999.

12.     Upon information and belief, the proceeds of the Note were fully funded on or before the Completion Date, and therefore PMC had no right to increase the Interest Rate under the Note absent an event of default.

13.     No event of default as defined in the Note or Construction Loan Agreement has ever occurred. LHG has never received any notice alleging default.

14.     The Interest Rate is governed by a "Permanent Rate Commencement Date," which is defined as "the earlier of (i) the date of full funding of this Promissory Note in accordance with the terms of the Construction Loan Agreement, (ii) the date of

4

issuance of the certificate of occupancy, as required in the Construction Loan Agreement, or (iii) July 27, 1999." *See* Attachment B at 1.

15.    Upon information and belief, the Permanent Rate Commencement Date was set as July 27, 1999.

16.    Upon information and belief, the Interest Rate remained at 9.00% and had not been adjusted by the Permanent Rate Commencement Date, and LHG had not received any notice indicating any adjustment in the Interest Rate by the Permanent Rate Commencement Date.

17.    The Note further provides: "Commencing on the first day of the second month immediately succeeding the Permanent Rate Commencement Date, and continuing on the first day of each month thereafter, payments shall be due in an amount necessary to fully amortize the stated principal balance of this Note over a period of twenty (20) years at the interest rate in effect on this Note, such payments to continue until an[d] including the date which is twenty (20) years from the date hereof (the 'Maturity Date') . . . ." *Id.* at 1.

18.    Upon information and belief, the Interest Rate remained at 9.00% and had not been adjusted by the "first day of the second month immediately succeeding the Permanent Rate Commencement Date," which was September 1, 1999.  Further, upon information and belief, LHG had not received any notice indicating any adjustment in the Interest Rate by September 1, 1999.

19.    The loan Maturity Date under the Note is January 20, 2019.  *See id.* at 1 (". . . such payments to continue until an[d] including the date which is twenty (20) years from [January 20, 1999]").

20.     On or around September 1, 1999, LHG dutifully began making payments in the amount of $19,560.04 per month pursuant to the Note and PMC's regular communications establishing that this was the precise amount due every month to fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date, as required under the Note.

21.     The 20-year amortization schedule created by PMC and relied on by LHG set the monthly payments at $19,560.04 based on the 9.00% Interest Rate.

22.     All monthly payments based on the 9.00% Interest Rate have been accepted, and LHG has historically relied on the acceptance of such payments to mean that the remaining principal balance of the Note would be fully amortized by the January 20, 2019 Maturity Date, as required under the Note.

23.     Upon information and belief, PMC may have increased the monthly payment amount to approximately $20,400 in late 1999 or early 2000, but PMC then immediately decreased the monthly payment back down to $19,560.04—based on the 9.00% Interest Rate.  Upon information and belief, LHG made only two payments at the higher amount before PMC reverted back to the original $19,560.04 amount in early or mid-2000.  Upon information and belief, the monthly payment amount reverted to $19,560.04 because PMC agreed to continue applying a 9.00% Interest Rate under the Note.  From that point forward, PMC's written communications consistently required monthly payments of $19,560.04 and represented that such payments would fully amortize the remaining principal balance of the Note by the January 20, 2019 Maturity Date, as required under the Note.

24.     LHG continues to make monthly payments of $19,560.04—based on the 9.00% Interest Rate—to this day.

25.     Upon information and belief, PMC or its servicer began including reference to a "9.50%" rate on loan statements provided to LHG years after the Permanent Rate Commencement Date.

26.     The loan statements referencing a "9.50%" rate consistently required the same monthly payments of $19,560.04 and represented that such payments would fully amortize the remaining principal balance of the Note by the January 20, 2019 Maturity Date, as required under the Note, despite any alleged permitted change to the Interest Rate.  These loan statements further represented that January 20, 2019 continued to be the defined and expected Maturity Date.

27.     LHG continued to make monthly payments of $19,560.04 based on these loan statements and communications representing that such payments would fully amortize the remaining principal balance of the Note by the January 20, 2019 Maturity Date, regardless of any alleged permitted change in the Interest Rate.

28.     On or around December 31, 2012—nearly 13 years after the Note was first executed—PMC's Chief Financial Officer sent a letter to LHG stating that PricewaterhouseCoopers had been engaged as an independent auditor to randomly examine various loan accounts "to confirm the accuracy of our financial records." Attachment C.  The letter included a "schedule of activity for your account during the twelve months ended [sic] December 31, 2012," and requested LHG to "examine the information below and indicate whether the balance is correct."  *Id.*  Upon information and belief, the schedule of activity attached to the letter represented, like all other

previous loan statements and communications, that monthly payments of $19,560.04—based on the 9.00% Interest Rate—would fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date, as required under the Note.

29.    On January 10, 2013—close to the Note's 13-year anniversary—PMC sent a letter to LHG stating that "[t]hrough an internal audit, we discovered that the monthly payments of $19,560.04 are too low to fully amortize the balance of the loan over the twenty-year term of the note.  This is not a notice of default.  The purpose of this letter is to explain the situation and offer several options to address it."  Attachment D at 1.  After recognizing that the Note "requires monthly payments 'in an amount necessary to fully amortize the stated principal balance of this Note over a period of twenty (20) years at the interest rate in effect on this Note,' " the letter stated that "[a] regular monthly payment amount of $20,404.99 would have been needed from the Permanent Rate Commencement Date . . . to fully amortize the balance over the term of the note."  *Id.*  The letter did not allege that PMC had permissibly increased the Interest Rate to 9.5% or include any details as to any alleged change in the Interest Rate from 9.00%.  The letter then presented 3 "options" for addressing "the shortfall in the past monthly payments": (1) pay a balloon payment of $563,901.68 at the Maturity Date; (2) keep the same historic monthly payment of $19,560.04 but extend the Maturity date to October 1, 2021; or (3) keep the same January 20, 2019 maturity date but increase the monthly payments to $25,497.86 starting immediately.  *Id.* at 1–2.  LHG rejected all three options based on PMC's consistent written communications over the last 13 years representing that monthly payments of $19,560.04—based on the 9.00% Interest

Rate—would fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date.

30.     Such written communications to LHG over many years were completely inconsistent with the exercise of any right to demand a balloon payment, increased monthly payments, or an extended Maturity Date under the Note, and reflect a full relinquishment and waiver of such right.

31.     Upon information and belief, LHG had never received any direct or formal notice that the Interest Rate had ever been adjusted to 9.50%, or that higher payments would be required to fully amortize the Note's principal balance by the January 20, 2019 Maturity Date, until this January 10, 2013 communication from PMC—13 years after the Note was executed, and after 13 years of consistent payments based on PMC's actions and written communications.   Upon information and belief, LHG received no further substantive communications from PMC about the Note.

32.     At or around the time PMC sent the January 10, 2013 letter, LHG requested documentation as to any alleged change to the Interest Rate and copies of any written notices sent to LHG about such change.  Upon information and belief, PMC provided a letter allegedly sent to LHG in 1999 or 2000 stating that the Interest Rate had been increased to 9.50%, but such letter indicated that it was sent to the wrong address and was never actually received by LHG.   In any event, PMC's consistent written communications over the previous 13 years (which were received by LHG at the correct address) expressly represented to LHG that monthly payments of $19,560.04— based on the 9.00% Interest Rate—would fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date.

33.     Upon information and belief, even if the Interest Rate could have been permissibly adjusted under the Note by the Permanent Rate Commencement Date in 1999, 9.5% was not the "rate charged on such date by [PMC] for similar type loans," as required under the Note.  Attachment B at 1.

34.     PMC never generated or provided an updated Promissory Note and amortization schedule to LHG applying an increased Interest Rate.

35.     In or around 2013, PMC sold the Note to Defendant Sutherland, which still owns the Note and is the successor-in-interest as lender under the Note.  The Note's transfer to Sutherland—and the subsequent time that passed before any additional substantive communication to LHG about the Note—further indicated to LHG that its continued historic monthly payments of $19,560.04 would fully amortize the Note's principal balance by the January 20, 2019 Maturity Date.

36.     After the Note's transfer to Sutherland, LHG continued to make the same monthly payments of $19,560.04—based on the 9.00% Interest Rate—that would fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date, as required under the Note.  LHG continues to make the same monthly payments to this day.

37.     On April 25, 2017—over 18 years after the Note's execution and 2 years before the Maturity Date—, counsel for Sutherland's loan servicer, ReadyCap Commercial LLC, sent a letter to LHG's counsel stating that "several years ago, PMC realized that under the current amortization schedule the monthly payments . . . were not sufficient to pay the Note in full by maturity."  Attachment E at 1.  The letter further explained: "The primary reason for the amortization shortfall . . . is because . . . PMC

increased the applicable interest rate on the Note to 9.5% per annum, but did not adjust the monthly payment amount upward to account for the increased monthly interest accrual." *Id.* The letter then alleged that a balloon payment of $541,927.84 would be due on the January 20, 2019 Maturity Date, and offered a 32-month extension of the Maturity Date and an increased monthly payment "to avoid unnecessary and costly litigation down the road." *Id.* at 2. As with PMC, LHG rejected this offer based on written communications over many years representing that monthly payments of $19,560.04—calculated from the 9.00% Interest Rate—would fully amortize the stated principal balance of the Note by the January 20, 2019 Maturity Date, and that no other payments would be required under the Note.

38.    Such written communications to LHG over many years were completely inconsistent with the exercise of the right to demand a balloon payment, increased monthly payments, or an extended Maturity Date under the Note, and reflect a full relinquishment and waiver of such right.

39.    LHG's counsel responded by letter on June 14, 2017 outlining LHG's position, requesting documentation supporting any alleged increase in the Interest Rate, and offering to initiate further negotiations, but neither Sutherland nor ReadyCap responded. LHG continues to make the same $19,560.04 monthly payments to this day.

40.    Effective November 30, 2017, Sutherland switched the servicing company for the Note from ReadyCap to Defendant KeyCorp through its KeyBank Real Estate Capital business unit.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201–2202)

41.    LHG incorporates the allegations in the paragraphs above, inclusive, as if fully set forth herein.

42.    Eight months ago, Sutherland threatened litigation and demanded increased payments and an extended Maturity Date under the 20-year Note—which is currently set to mature on January 20, 2019.  Sutherland indicated that it would wrongfully demand a balloon payment of $541,927.84 on that Maturity Date even if LHG continues to make its required payments of $19,560.04, as it has done since 1999.

43.    LHG maintains that PMC, as the original lender, never had the right to adjust the Interest Rate at all under the Note, because, upon information and belief, the proceeds of the Note were fully funded on or before the Completion Date.

44.    LHG further maintains that even if PMC had the right to adjust the Interest Rate, it did not do so by the Permanent Rate Commencement Date or the first day of the second month following the Permanent Rate Commencement Date, as required under the Note.

45.    LHG further maintains that even if PMC adjusted the Interest Rate in time, PMC was not permitted to increase the rate to 9.5% because this was not "rate charged on such date by [PMC] for similar type loans," as required under the Note.

46.    LHG further maintains that even if PMC had permissibly adjusted the Interest Rate in the time allotted under the Note, it waived its rights to demand a balloon payment, increase the monthly payments, or extend the Maturity Date by sending written communications to LHG over many years representing that payments of

$19,560.04 would fully amortize the Note's principal balance by the January 20, 2019 Maturity Date.

47.     LHG further maintains that as PMC's successor-in-interest, Sutherland also waived its rights to demand a balloon payment, increase the monthly payments, or extend the Maturity Date, not only through PMC's actions, but through its own actions and delays.

48.     The facts presented in this lawsuit present a justiciable controversy well suited for this Court to declare the parties' rights and obligations prior to the Maturity Date and the threatened balloon payment demand of $541,927.84.

49.     As the servicing company for the Note, KeyCorp has an interest in this dispute and is a required party in this declaratory judgment action.

50.     PMC no longer has any interest in the Note or this dispute.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment Pursuant to Texas Uniform Declaratory Judgments Act,**

**Tex. Civ. Prac. & Rem. Code §§ 37.001, et seq.)**

51.     LHG incorporates the allegations in the paragraphs above, inclusive, as if fully set forth herein.

52.     The Note is governed by the laws of the State of Texas and the laws of the United States.  Attachment B at 5.

53.     Sutherland recently threatened litigation and demanded increased payments under the 20-year Note—which is set to mature on January 20, 2019. Sutherland indicated that it would wrongfully demand a balloon payment of $541,927.84

on that Maturity Date if LHG continues to dutifully make its required payments of $19,560.04, as it has done since 1999.

54.    LHG maintains that PMC, as the original lender, never had the right to adjust the Interest Rate at all under the Note, because, upon information and belief, the proceeds of the Note were fully funded on or before the Completion Date.

55.    LHG further maintains that even if PMC had the right to adjust the Interest Rate, it did not do so by the Permanent Rate Commencement Date or the first day of the second month following the Permanent Rate Commencement Date, as required under the Note.

56.    LHG further maintains that even if PMC adjusted the Interest Rate in time, PMC was not permitted to increase the rate to 9.5% because this was not "rate charged on such date by [PMC] for similar type loans," as required under the Note.

57.    LHG further maintains that even if PMC had permissibly adjusted the Interest Rate in the time allotted under the Note, it waived its rights to demand a balloon payment, increase the monthly payments, or extend the Maturity Date by sending written communications to LHG over many years representing that payments of $19,560.04 would fully amortize the Note's principal balance by the January 20, 2019 Maturity Date.

58.    LHG further maintains that as PMC's successor-in-interest, Sutherland also waived its rights to demand a balloon payment, increase the monthly payments, or extend the Maturity Date, not only through PMC's actions, but through its own actions and delays.

14

59.    The facts presented in this lawsuit present a justiciable controversy well suited for this Court to declare the parties' rights and obligations prior to the Maturity Date and the threatened balloon payment demand of $541,927.84.

60.    As the servicing company for the Note, KeyCorp has an interest in this dispute and is a required party in this declaratory judgment action.

61.    PMC no longer has any interest in the Note or this dispute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Louisville Hospitality Group prays that judgment be entered in its favor and against Defendants Sutherland Asset I, LLC and KeyCorp on the claims asserted herein and that it be awarded the following relief:

1.    A declaration that the original 9.00% rate is—and always has been—the effective Interest Rate under the Note;

2.    In the event that the Court finds that the Interest Rate was permissibly increased to 9.5% under the Note, a declaration that PMC Commercial Trust and its successor-in-interest Sutherland Asset I, LLC waived the right to demand a balloon payment, increase the monthly installments, or extend the Maturity Date;

3.    A declaration that the current amortization schedule and monthly payment amount under the Note should remain the same, and that Defendants Sutherland Asset I, LLC and KeyCorp have no right to demand a balloon payment, increased monthly payments, an extended Maturity Date, or any other relief;

4.    An award of costs, attorney's fees, and expenses incurred herein to the maximum extent allowed by law; and

5.    Such further relief as this Court may deem just and proper.

Respectfully submitted this 3rd day of January, 2018.

By: */s/ Meshach Y. Rhoades*
   Meshach Y. Rhoades, #35965
   William M. Ojile, Jr., #26531
   Martin Estevao, #46260
   Armstrong Teasdale LLP
   4643 South Ulster Street, Suite 800
   Denver, Colorado 80237
   Telephone: 720-722-7196
   Facsimile: 720-200-0679
   mrhoades@armstrongteasdale.com
   bojile@armstrongteasdale.com
   mestevao@armstrongteasdale.com

*Attorneys for Plaintiff Louisville Hospitality*
*Group, Inc.*

Case 1:17-cv-03092   Document 1-1   Filed 12/21/17   USDC Colorado   Page 1 of 33

# ATTACHMENT A

# CONSTRUCTION LOAN AGREEMENT

**THIS LOAN AGREEMENT,** dated ⟨ʒₒᴣᴀ⟩, 1999, is made by and between PMC COMMERCIAL TRUST, a Texas real estate investment trust ("Lender"), whose address is 18111 Preston Road, Suite 600, Dallas, Texas 75252, and LOUISVILLE HOSPITALITY GROUP, INC., a Colorado corporation, whose address is 960 W. Dillon Road, Louisville, Colorado 80027 (the "Borrower"), in respect of a loan in the principal sum of Two Million One Hundred Seventy-Four Thousand and No/100 Dollars ($2,174,000.00).

## ARTICLE 1 - DEFINITIONS

For purposes of this Loan Agreement, the following terms shall have the respective meanings assigned to them.

1.1     Advance.  The term "Advance" shall mean a disbursement by Lender of any of the proceeds of the Loan and/or the Borrower's Deposit.

1.2     Affidavit of Borrower.  The term "Affidavit of Borrower" shall mean a sworn affidavit of Borrower (and such other parties as Lender may require) to the effect that all statements, invoices, bills, and other expenses incident to the acquisition of the Property and the construction of the Improvements incurred to a specified date, whether or not specified in the Approved Budget, have been paid in full, except for (a) amounts retained pursuant to the Construction Contract, and (b) items to be paid from the proceeds of an Advance then being requested or in another manner satisfactory to Lender.

1.3     Application for Advance.  The term "Application for Advance" shall mean a written application (on a form approved by Lender) by Borrower (and such other parties as Lender may require) to Lender specifying by name, current address, and amount all parties to whom Borrower is obligated for labor, materials, or services supplied for the construction of the Improvements and all other expenses incident to the Loan, the Property, and the construction of the Improvements, whether or not specified in the Approved Budget, requesting an Advance for the payment of such items, containing, if requested by Lender, an Affidavit of Borrower, accompanied by such schedules, affidavits, releases, waivers, statements, invoices, bill, and other documents as Lender may reasonably request.

1.4     Approved Budget.  The term "Approved Budget" shall mean a budget or cost itemization prepared by Borrower specifying the cost by item of (a) all labor, materials, and services necessary for the construction of the Improvements in accordance with the Plans and all Governmental Requirements, and (b) all other expenses anticipated by Borrower incident to the Loan, the Property, and the construction of Improvements. The Approved Budget is attached hereto as Exhibit "C" and incorporated herein by reference.

1.5     Architect.  The term "Architect" shall mean the Architect named on Exhibit "D" attached hereto and incorporated herein by reference.

Construction Loan Agreement - Page 1

1.6    Architectural Contract. The term "Architectural Contract" shall mean a written agreement between Borrower and Architect for architectural services pertaining to construction of the Improvements.

1.7    Borrower. The term "Borrower" shall mean all parties named Borrower in the first paragraph of this Loan Agreement.

1.8    Borrower's Deposit. The term "Borrower's Deposit" shall mean such cash sums as Lender may deem necessary, from time to time until the Loan is paid in full, in addition to the Loan, for the payment of the costs of labor, materials, and services required for the construction of the Improvements, other costs and expenses specified in the Approved Budget, and other costs and expenses required to be paid in connection with the construction of the Improvements in accordance with the plans, and any Governmental Requirements.

1.9    Code. The term "Code" shall mean the Uniform Commercial Code as in force in the State of Texas.

1.10    Completion Date. The term "Completion Date" shall mean the date set forth on Exhibit "D" attached hereto.

1.11    Construction Contract. The term "Construction Contract" shall mean all construction contracts executed by Borrower for the construction of the Improvements, including, without limitation, contracts between Borrower and Contractor.

1.12    Contractor. The term "Contractor" shall mean the contractors, whether one or more, named in Exhibit "D" attached hereto.

1.13    Debtor Relief Laws. The term "Debtor Relief Laws" shall mean any applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar laws affecting the rights or remedies of creditors generally, as in effect from time to time.

1.14    Event of Default. The term "Event of Default" shall mean the occurrence of any one of the following:

    (a)    Any indebtedness evidenced, governed or secured by any of the Loan Instruments is not paid when due, whether by acceleration or otherwise.

    (b)    Any covenant in this Agreement or any of the other Loan Instruments is not fully and timely performed, or the occurrence of any default or event of default thereunder.

    (c)    Any statement, representation or warranty in the Loan Instruments, any Financial Statements or any other writing delivered to Lender in connection with the Loan is false, misleading or erroneous in any material respect.

    (d)    The cessation of the construction of the Improvements for more than

fifteen (15) days without the written consent of Lender.

(e)     Failure of the construction of the Improvements or any materials for which an Advance has been requested to comply with the Plans or any Governmental Requirements.

(f)     Failure of Borrower to satisfy any condition specified herein as precedent to the obligation of Lender to make an Advance after an Application for Advance has been submitted.

(g)     A reasonable determination by Lender that construction of the Improvements will not be completed on or before the Completion Date.

(h)     The owner of the Property or any person obligated to pay any part of the indebtedness evidenced, governed or secured by the Loan Instruments:

    (1)     does not pay its debts as they become due or admits in writing its inability to pay its debts or makes a general assignment for the benefit of creditors; or

    (2)     commences any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Debtor Relief Laws; or

    (3) in any involuntary case, proceeding or other action commenced against it which seeks to have an order for relief entered against it, as debtor, or seeks reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debris, (i) fails to obtain a dismissal of such case, proceeding or other action within thirty (30) days of its commencement, or (ii) converts the case from one chapter of the Federal Bankruptcy Code to another chapter, or (iii) is the subject of an order for relief; or

    (4)     conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,  or makes or suffers a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditors to obtain a lien upon an of its property through legal proceedings which are not vacated within thirty (30) days from the date thereof; or

    (5)     has a trustee, receiver, custodian or other similar official appointed for or take possession of all or any part of the Property or an other of its property or has any court take jurisdiction of any other of its property which continues for a period of thirty (30) days (except where a shorter period is specified in the

immediately following subparagraph (6); or

(6)     fails to have discharged within a period of ten (10) days any attachment, sequestration, or similar writ levied upon any property of such person; or

(7) fails to pay immediately any final money judgment against such person.

(i)     Title to all or any part of the Property (other than obsolete or worn personal property replaced by adequate substitutes of equal or greater value than the replaced items when new) shall become vested in any party other than the granting party named in the Mortgage, whether by operation of law or otherwise, or any lien or encumbrance is granted in the Property, whether by operation of law or otherwise. Lender may, in its sole discretion, waive this Event of Default, but it shall have no obligation to do so, and any waiver may be conditioned upon such one or more of the following as Lender may require: the grantee's integrity, reputation, character, creditworthiness and management ability being satisfactory to Lender in its sole judgment, the grantee executing, prior to such sale or transfer, a written assumption agreement containing such terms as Lender may require, a principal pay down on the Note, an increase in the rate of interest payable under the Note, a transfer fee, and any other modification of the Loan Instruments which Lender may require.

(j)     Without the prior written consent of Lender, the owner of the Property grants any easement or dedication, files any plat, condominium declaration, or restriction, or otherwise encumbers the Property, unless such action is expressly permitted by the Loan Instruments or does not affect the Property.

(k)     Without the prior written consent of Lender, the owner of the Property enters into any lease of part or all of the Property.

(l)     Borrower or the owner of the Property (if other than Borrower) abandons any of the Property.

(m)     Lender reasonably determines that the condition of the Property has deteriorated.

(n)     The holder of any lien, security interest or assignment on the Property institutes foreclosure or other proceedings or takes other action for the enforcement of its remedies thereunder.

(o)     The liquidation, termination, dissolution, death, or legal incapacity of Borrower, the owner of the Property or any Guarantor.

(p)     Belief by Lender that the prospect of payment or performance of any obligation under any of the Loan Instruments is impaired.

(q)     The occurrence of any material adverse change in the financial condition of Borrower.

(r)     The sale, lease, transfer or other disposition of all or any part of Borrower's assets (now or hereafter acquired) except that Borrower may sell other assets in the ordinary course of business as presently conducted, provided that such sale or lease shall not be for less than the fair market value of such assets or be on terms which are not commercially reasonable and provided further that such sale shall not constitute or give rise to a default under any agreement to which Borrower is a party or by which Borrower is bound.

(s)     The pledging, mortgaging, granting of a lien on or security interest in, or other hypothecation or encumbrance of all or any part of Borrower's assets (nor or hereafter acquired) except to secure indebtedness to Lender.

(t)     The occurrence of a default under any other document evidencing, securing or executed in connection with the Loan.

1.15    Financial Statements.  The term "Financial Statements" shall mean such balance sheets, profit and loss statements, reconciliations of capital and surplus, changes in financial condition, schedules of sources and uses of funds, operating statements with respect to the Property, pro forma schedules of sources and uses of funds for ensuing twelve-month periods, and other financial information of Borrower as shall be required by Lender, from time to time, which statements shall be certified as true and correct by the party submitting such statements or, if required by Lender, shall be certified by an independent certified public accountant.

1.16    Financing Statements.  The term "Financing Statements" shall mean the Form UCC-1 financing statements perfecting the security interests securing the Loan, to be filed with the appropriate offices for the perfection of a security interest in any other the Property.

1.17    Governmental Authority.  The term "Governmental Authority" shall mean the United States, the state, the county, the city, or any other political subdivision in which the Property is located, and any other political subdivision, agency, or instrumentality exercising jurisdiction over Borrower or the Property.

1.18    Governmental Requirements.  The term "Governmental Requirements" shall mean all laws, ordinances, rules, and regulations of any Governmental Authority applicable to Borrower or the Property, including, but not limited to, the Americans with Disabilities Act.

1.19    Guarantor.  The term "Guarantor" shall mean Parmod K. Malik, Rita Malik, Lallubhai R. Patel, Manjulaben L. Patel, Satish Patel, Gita S. Patel, Dipak N. Patel, Nila D. Patel, Vinaychandra Patel and Sushma V. Patel.

1.20    Hazardous Materials.  The term "Hazardous Materials" shall mean (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), as amended from time to time, and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) underground storage tanks, whether empty, filled or partially filled with any substance; (f) any substance the presence of which on the Property is prohibited by any Governmental Requirements; and (g) any other substance which by any Governmental Requirements requires special handling or notification of any federal, state or local governmental entity in its collection, storage, treatment or disposal.

    1.21   Hazardous Materials Contamination.   The term "Hazardous Materials Contamination" shall mean the contamination (whether presently existing or hereafter occurring) of the Improvements, facilities, soil, groundwater, air or other elements on or of the Property by Hazardous Materials, or the contamination of the buildings, facilities, soil, groundwater, air other elements on or of any other property as a result of Hazardous Materials at any time (whether before or after the date of this Loan Agreement) emanating from the Property.

    1.22   Improvements. The term "Improvements" shall mean the Improvements identified on Exhibit D attached hereto.

    1.23   Inspecting Architects/Engineers. The term "Inspecting Architects/Engineers" shall mean such employees, representatives and agents of Lender or third parties, who may, from time to time, conduct inspections of the Property or offer other services related thereto.

    1.24   Insurance Policies.  The term "Insurance Policies" shall mean:

    (a)   All-risk builder's risk insurance during the construction of the Improvements, in an amount equal to 100% of the replacement cost of the Improvements, providing all-risk coverage on the Improvements and materials stored on collapse, damage resulting from error in design or faulty workmanship or materials, water damage and, if requested by Lender, flood, earthquake, business interruption, permission to occupy, interest costs and other risks;

    (b)   All-risk insurance after the completion of the construction of the Improvements, as determined by Lender, in the amount of at least 100% of the replacement cost of such Improvements or in such additional amounts as a Lender may require, providing all-risk coverage on the Improvements, and, if requested by Lender, to include the perils of flood, earthquake, business interruption and other risks;

    (c) Comprehensive General Liability Insurance for owners and contractors, including blanket contractual liability, products and completed operations, personal injury (including employees), independent contractors, explosion, collapse and underground hazards for not less than $5,000,000 arising out of any one occurrence or in any increased amount required by Lender;

    (d)   Comprehensive Automobile Liability Insurance for contractors for not less than $500,000 for bodily injury and $100,000 for property damage arising out of any one occurrence or in any increased amount required by Lender;

    (e)      Workers' Compensation Insurance of contractors for statutory limits;

    (f)      Life Insurance policy in the amount of $750,000.00 on Hitesh Patel, collaterally assigned to Lender; and

    (g)      Such other insurance as Lender may require.

All Insurance Policies shall be issued on forms and by companies satisfactory to Lender and shall be delivered to Lender at the following address: 17290 Preston Road, Third Floor, Dallas, Texas 75252, Attention: Barbara West. All-risk Insurance Policies shall have loss made payable to Lender as mortgagee together with the standard mortgage clause in the form set forth on Exhibit "D" attached hereto. Comprehensive General Liability, Comprehensive Automobile Liability and Workers' Compensation coverage and the Life Insurance policies shall have a provision giving Lender thirty (30) days' prior notice of cancellation or material change of the coverage.

    1.25   Lender. The term "Lender" shall mean the Lender named in the first paragraph of this Loan Agreement.

    1.26   Loan. The term "Loan" shall mean the Loan by Lender to Borrower, in an amount set forth in the first paragraph of this Loan Agreement, not to exceed, in the aggregate, the payment of the costs of labor, materials and services supplied for the construction of the Improvements and all other expenses incident to the acquisition and the construction of the Property, all as specified in the Approved Budget.

    1.27   Loan Instruments. The term "Loan Instruments" shall mean this Loan Agreement, the Mortgage, the Note, the Financing Statements, and such other instruments evidencing, securing, or pertaining to the Loan as shall, from time to time, be executed and pursuant to this Loan Agreement, including, without limitation, each Affidavit of Borrower, each Application for Advance, and the Approved Budget.

    1.28   Mortgage. The term "Mortgage" shall mean the Mortgage or Deed of Trust securing the payment of the Note and the payment and performance of all obligations specified in the Mortgage and this Loan Agreement, and evidencing a valid and enforceable lien on and direct assignment of the Property.

    1.29   Note. The term "Note" shall mean, collectively, that certain promissory note of even date herewith in the original principal amount of $2,174,000.00, executed by Borrower and payable to Lender.

    1.30   Plans. The term "Plans" mean the final working drawings and specifications for the construction of the Improvements.

    1.31   Property. The term "Property" shall mean the land described in Exhibit "A" attached hereto and incorporated herein by reference, together with the Improvements and all other property constituting the "Property," as defined in the Mortgage, and the collateral described in the Security Agreement.

1.32   Security Agreement.  The term "Security Agreement" shall mean a Security Agreement granting to Lender a security interest in collateral for the Loan in addition to any collateral which is described in the Mortgage and covered by the security agreement included therein.

1.33   Survey.  The term "Survey" shall mean a current certified survey of the Property satisfying the requirements set forth on Exhibit "D" attached hereto and/or a recorded plat or map of the Property, as required by Lender, which such plat or map shall be approved and accepted by all Governmental Authorities having jurisdiction of the Property.

1.34   Title Company.  The term "Title Company" shall mean the Title Company named on Exhibit "D" attached hereto.

1.35   Title Insurance.  The term "Title Insurance" shall mean a title insurance commitment, binder, or policy, as Lender may require, in the amount of the Loan, insuring or committing to insure that the Mortgage constitutes a valid lien covering the Property having the priority required by Lender and subject only to those exceptions and encumbrances which Lender may approve, issued by the Title Company.

## ARTICLE 2 - ADVANCES OF THE LOAN

2.1   Commitment of Lender.  Subject to the conditions hereof, and provided that an Event of Default has not occurred, Lender will make Advances to Borrower in accordance with this Loan Agreement.

2.2   Interest on the Loan.  Interest on the Loan, at the rate or rates specified in the Note, shall be computed on the unpaid principal which exists from time to time and shall be computed with respect to each Advance only from the date of such Advance (as to the portion of each Advance not constituting a portion of Borrower's Deposit).

2.3   Advances.  Advances for the payment of costs of labor, materials, and services supplied for the construction of the Improvements and the other items shown in the Approved Budget shall be made by Lender, not more frequently than specified on Exhibit "D" attached hereto, upon compliance by Borrower with this Loan Agreement, after actual commencement of construction of the Improvements, for work actually done during the preceding period.  From time to time, Borrower shall submit an Application for Advance to Lender requesting an Advance for the payment of costs of labor, materials, and services supplied for the construction of the Improvements or for the payment of other costs and expenses incident to the Loan, the acquisition of the Property, or the construction of the Improvements, and specified in the Approved Budget.  Lender may require an inspection of and acceptable report on the Improvements by the Inspecting Architects/Engineers prior to making any Advance, and may reject any application for advance if the report provided is unacceptable. Advances for payment of costs of construction of the Improvements and the other items shown in the Approved Budget shall be limited to the amounts shown in the Approved Budget and not exceed the aggregate of (a) the costs of labor, materials, and services incorporated into the Improvements in a manner acceptable to Lender, plus (b) if approved by Lender, the purchase price of all uninstalled materials to be utilized in the construction of the Improvements stored on the Property or else

where with the written consent of, and in a manner acceptable to, Lender, less (c) retainage, in any, as set forth on Exhibit "D" attached hereto, and less (d) all prior Advances for payment of costs of labor, materials, and services for the construction of the Improvements. Each Application for Advance shall be submitted by Borrower to Lender on or before the 25th day of the month. The final Advance, including all retainage, will not be made until the Lender has received the following: (1) a completion certificate from the Inspecting Architects/Engineers, if any, (2) evidence that all Governmental Requirements have been satisfied, including, but not limited to, delivery to Lender of Certificates of Occupancy permitting the Improvements to be legally occupied, (3) evidence that no mechanic's or materialman's lien or other encumbrance has been filed and remains in effect against the Property, (4) final lien releases or waivers by Architect, Contractor, and all subcontractors, materialmen, and other parties who have supplied labor, materials, or services for the construction of the Improvements, or who otherwise might be entitled to claim a contractual, statutory, or constitutional lien against the Property, (5) if available under local rules, the Title Insurance shall be endorsed and extended to acknowledge completion of construction of the Improvements without any encroachment and in compliance with all applicable matters of public record and Governmental Requirements, with no additional exception objectionable to Lender and (6) an Affidavit of Completion (as required or approved by Colorado law) in form acceptable to Lender, executed by Borrower and Contractor and the expiration of thirty (30) days from the recording thereof in the County real property records.

2.4     Conditions to the First Advance.  As a condition precedent to the First Advance hereunder, Borrower must satisfy the conditions required hereby and execute and deliver to, procure and deposit with, and pay to Lender and, if appropriate, record in the property records with all filing and recording fees paid the documents, certificates, and other items that are described in Exhibit "B" attached hereto and incorporated herein by reference, together with such other documents, instruments, and certificates as Lender may reasonably require.

2.5     Conditions to Subsequent Advances.  As a condition precedent to each Advance other than the First Advance, in addition to all other requirements herein, Borrower must satisfy the following requirements and, if required by Lender, deliver to Lender evidence of such satisfaction.

        (a)     All conditions precedent to the First Advance shall have been satisfied;

        (b)     There shall then exist no Event of Default;

        (c)     A foundation survey shall have been furnished to Lender prior to the laying of the foundation of the Improvements, showing no encroachment of the Improvements on any boundary line, easement, building setback line, or other restricted area;

        (d)     The representations and warranties made in this Loan Agreement shall be true and correct on and as of the date of each Advance, with the same effect as if made on that date;

        (e) Borrower will procure and deliver to Lender, if required by Lender, releases or waivers of mechanics' liens and receipted bills showing payment of all parties who

have furnished materials or services or performed labor of any kind in connection with the construction of any of the Improvements; and

(f)    The Title Insurance shall be endorsed and extended, if available under local rules, to cover each Advance with no additional title exception objectionable to Lender.

2.6    Reallocation of Approved Budget.  Lender reserves the right to make Advances which are allocated to any of the designated items in the Approved Budget for such other purposes or in such different proportions as Lender may, it its sole discretion, deem necessary or advisable.  Borrower may not reallocate items of cost or change the Approved Budget without the prior written consent of Lender.

2.7    No Waiver.  No Advance shall constitute a waiver of any condition precedent to the obligation of Lender to make any further Advance or preclude Lender from thereafter declaring the failure of Borrower to satisfy such condition precedent to be an Event of Default.

2.8    Conditions Precedent for the Benefit of Lender.  All conditions precedent to the obligation of Lender to make any Advance are imposed hereby solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any Advance in the absence of strict compliance with such continuous precedent.  All requirements of this Loan Agreement may be waived by Lender, in whole or in part, at any time.

2.9    Subordination.  Lender shall not be obligated to make, nor shall Borrower be entitled to, any Advance until such time as Lender shall have received, to the extent requested by Lender, subordination agreements from Architect, Contractor, and all other persons furnishing labor, materials, or services for the design or construction of the Improvements, subordinating to the provisions of the Mortgage any lien, claim, or charge they may have against Borrower or the Property.

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower hereby represents and warrants as follows:

3.1    Financial Statements.  The Financial Statements are true, correct, and complete as of the dates specified therein and fully and accurately present the financial condition of Borrower as of the dates specified.  No material adverse change has occurred in the financial condition of Borrower since the dates of the Financial Statements.

3.2    Suits, Actions, Etc.  There are no actions, suits, or proceedings pending or to the knowledge of Borrower threatened in any court or before or by any Governmental Authority against or affecting Borrower or the Property, or involving the validity, enforceability, or priority of any of the Loan Instruments, at law or in equity.  The consummation of the transactions contemplated hereby, and the performance of any of the terms and conditions hereof and of the other Loan Instruments, will not result in a breach of, or constitute a default in, any mortgage, deed of trust, lease, promissory note, loan agreement, credit agreement, partnership

agreement, or other agreement to which Borrower is a party or by which Borrower may be bound or affected. Borrower is not in default of any order of any court or any requirement of any Governmental Authority.

3.3    <u>Valid and Binding Obligation</u>. All of the Loan Instruments, and all other documents referred to herein to which Borrower is a party, upon execution and delivery will constitute valid and binding obligations of Borrower, enforceable in accordance with their terms except as limited by Debtor Relief Laws.

3.4    <u>Title to the Property</u>. Borrower holds full legal and equitable title to the Property, subject only to title exceptions set forth in the Title Insurance.

3.5    <u>Commencement of Construction</u>. Prior to the recordation of the Mortgage, no work of any kind (including the destruction or removal of any existing improvements, site work, clearing, grubbing, draining, or fencing of the Property) shall have commenced or shall have been performed on the Property, no equipment or material shall have been delivered to or upon the Property for any purpose whatsoever, and no contract (or memorandum or affidavit thereof) for the supplying of labor, materials, or services for the construction of the Improvements shall have been recorded in the mechanic's lien or other appropriate records in the county where the Property is located.

3.6    <u>Disclosure</u>. There is no fact that Borrower has not disclosed to Lender in writing that could materially adversely affect the property, business or financial condition of Borrower, Guarantor or the Property.

3.7    <u>Compliance with Environmental Requirements; No Hazardous Materials</u>.

(a) No Hazardous Materials are located on the Property or have been released into the environment, or deposited, discharged, placed or disposed of at, on, under or near the Property. No portion of the Property is being used or, to the knowledge of Borrower, has been used at any previous time for the disposal, storage, treatment, processing or other handling of Hazardous Materials Contamination.

(b) To the best of Borrower's knowledge, no Hazardous Materials are located in the vicinity of the Property, no property adjoining the Property is being used, or has ever been used at any previous time, for the disposal, storage, treatment, processing or other handling of Hazardous Materials, nor is any other property adjoining the Property affected by Hazardous Materials Contamination.

(c) No polychlorinated biphenyls are located on or in the Property, in the form of electrical transformers, fluorescent light fixtures with ballasts, cooling oils, or any other device or form.

(d) No investigation, administrative order, consent order and agreement, litigation or settlement with respect to Hazardous Materials or Hazardous Materials Contamination is proposed, threatened, anticipated or in existence with respect to the Property. The Property and its existing and prior uses comply and at all times have

complied with any applicable Governmental Requirements relating to environmental matters or Hazardous Materials. There is no condition on the Property which is in violation of any applicable Governmental Requirements relating to Hazardous Materials, and Borrower has received no communication from or on behalf of any Governmental Authority that any such condition exists. The Property is not currently on and, to Borrower's knowledge after diligent investigation and inquiry, has never been on any federal and state "Superfund" or "Superlien" list.

(e)     All representations and warranties contained in this Section shall survive the consummation of the transactions contemplated in this Agreement.

3.8     <u>System Compliance</u>.  The storm and sanitary sewer system, water system, all mechanical systems of the Property and other parts of the Improvements do (or when constructed will) comply with all applicable environmental, pollution control and ecological laws, ordinances, rules and regulations, and all Governmental Authorities having jurisdiction of the Property have issued all necessary permits, licenses or other authorizations for the construction, occupancy, operations, and use of the Improvements (specifically including the named systems).

3.9     <u>Submittals</u>.  The Loan Instruments and all Financial Statements, Plans, budgets, schedules, opinions, certificates, confirmations, Contractor's statements, applications, rent rolls, affidavits, agreements, Construction Contract, Architectural Contract and other materials submitted to the Lender in connection with and in furtherance of the Loan Instruments by or on behalf of the Borrower or any Guarantor fully and fairly state the matters with which they purport to deal, and neither misstate any material fact, nor separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

3.10     <u>Utility Availability</u>.  Subject only to payment of fees to be paid from the Approved Budget, all utility and municipal services required for the construction, occupancy and operation of the Improvements, including, but not limited to, water supply, storm and sanitary sewer systems, gas, electric and telephone facilities, are available for use and tap-on at the boundaries of the Property and will be available in sufficient amounts for the normal and intended use of the Improvements, and written permission has been or will be obtained from the applicable utility companies or municipalities to connect the Improvements into said services.

3.11     <u>Americans With Disabilities Act</u>.  Borrower, the Property, the Plans, and all other matters relating to the Loan and the construction of the Improvements are in full compliance with all Governmental Requirements, including, but not limited to, the Americans with Disabilities Act and any state regulation related to handicap accessibility.

3.12     <u>Inducement to Lender</u>.  The representations and warranties contained in the Loan Instruments are made by Borrower as an inducement to Lender to make the Loan and Borrower understands that Lender is relying on such representations and warranties and that such representations and warranties shall survive any (a) bankruptcy proceedings involving Borrower, Guarantor or the Property, or (b) foreclosure of the Mortgage or (c) conveyance of title to the Property in lieu of foreclosure the Mortgage.  Acceptance of each advance constitutes reaffirmation, as of the date of such acceptance, of the representations and warranties of Borrower in the Loan Instruments, on which Lender shall rely in making such Advance.

## ARTICLE 4 - <u>COVENANTS AND AGREEMENTS OF BORROWER</u>

Borrower hereby covenants and agrees as follows:

4.1    <u>Compliance with Governmental Requirements</u>. Borrower shall timely comply with all Governmental Requirements and deliver to Lender evidence thereof. Borrower assumes full responsibility for the compliance of the Plans and the Property with all Governmental Requirements and with sound building and engineering practices, and, notwithstanding any approvals by Lender, Lender shall have no obligation or responsibility whatsoever for the Plans or any other matter incident to the Property or the construction of the Improvements. Immediately upon Borrower's receipt of any notice from a Governmental Authority of noncompliance with any Governmental Requirements, Borrower shall provide Lender with written notice thereof.

4.2    <u>Construction Contract</u>. Borrower shall become a party to no contract, including the Construction Contract, for the performance of any work on the Property or for the supplying of any labor, materials, or services for the construction of the Improvements except upon such terms and with such parties as shall be approved in writing by Lender. The Construction Contract shall provide that all liens of the Contractor are subordinate to the Mortgage and that the Contractor waives any right to remove removable improvements and shall require all subcontracts and purchase orders to contain a provision subordinating the subcontractors' and materialmen's liens to the Mortgage and waiving any right to remove removable improvements. The Construction Contract shall also provide that no change order shall be effective without the prior written approval of Lender. No approval by Lender of any Construction Contract or change order shall make Lender responsible for the adequacy, form, or content of such Construction Contract.

4.3    <u>Construction of the Improvements</u>. Borrower shall commence construction of the Improvements within thirty (30) days from the date hereof, and the construction of the Improvements shall be prosecuted with diligence and continuity, in a good and workmanlike manner, and in accordance with sound building and engineering practices, all applicable Governmental Requirements, and the Plans. Borrower shall not permit cessation of work for a period in excess of 15 days without the prior written consent of Lender and shall complete construction of the Improvements on or before the Completion Date, free and clear of all liens.

4.4    <u>Correction of Defects</u>. Borrower shall correct or cause to be corrected (a) any material defect in the Improvements, (b) any material departure in the construction of the Improvements from the Plans, the requirements of the Loan Commitment, Governmental Requirements, or the requirements of any lessee, if applicable, or (c) any encroachment by any part of the Improvements, or any structure located on the Property, on any easement, property line, or restricted area, or any encroachment by any such structure on any building line.

4.5    <u>Storage of Materials</u>. Borrower shall cause all materials supplied for, or intended to be utilized in, the construction of the Improvements, but not affixed to or incorporated into the Improvements or the Property, to be stored on the Property or at such other location as may be approved by Lender in writing, with adequate safeguards, as required by Lender, to prevent loss, theft, damage, or commingling with other materials or projects.

<u>Construction Loan Agreement</u> - **Page 13**

4.6    Inspection of the Property.  Borrower shall permit Lender, any Governmental Authority, the Inspecting Architects/Engineers, and their agents and representatives, to enter upon the Property and any location where materials intended to be utilized in the construction of the Improvements are stored, of the purpose of inspection of the Property and such materials at all reasonable times.

4.7    Notices by Governmental Authority, Casualty, Condemnation.  Borrower shall timely comply with and promptly furnish to Lender true and complete copies of any notice or claim by any Governmental Authority pertaining to the Property.  Borrower shall promptly notify Lender of any fire or other casualty or any notice of taking or eminent domain action or proceeding affecting the Property, or the threat of any such action or proceeding of which Borrower becomes aware.

4.8    Special Account.  Borrower shall maintain a special account, into which all Advances (but no other funds), and excluding direct disbursements made by Lender pursuant to Section 4.11 hereof, shall be deposited by Borrower, and against which checks shall be drawn only for the payment of (a) costs of labor, materials, and services supplied for the construction of the Improvements specified in the Approved Budget, and (b) other costs and expenses incident to the Loan, the Property, and the construction of the Improvements specified in the Approved Budget.

4.9    Application of Advances.  Borrower shall disburse all Advances for payments of costs and expenses specified in the Approved Budget, and for no other purpose.

4.10    Borrower's Deposit.  If Lender reasonably determines at any time that the unadvanced portion of the Loan will be insufficient for payment in full of (a) costs of labor, materials, and services required for the construction of the Improvements, (b) other costs and expenses specified in the Approved Budget, (c) interest from time to time owing or to become owing on the Loan, and (d) other costs and expenses required to be paid in connection with the construction of the Improvements in accordance with the Plans, or any Governmental Requirements, then Borrower shall, on request of Lender, make the Borrower's Deposit with Lender.  Lender shall not be required to pay interest on such Borrower's Deposit prior to any portion of the Loan proceeds.  Borrower shall promptly notify Lender in writing if and when the cost of the construction of the Improvements exceeds, or appears likely to exceed, the amount of the unadvanced portion of the Loan and the unadvanced portion of the Borrower's Deposit.

4.11    Direct Disbursements and Application by Lender.  Lender shall have the right, but not the obligation, to disburse and directly apply the proceeds of any Advance to the satisfaction of any Borrower's obligations hereunder and under any of the other Loan Instruments.  Any Advance by Lender for such purpose, except Borrower's Deposit, shall be part of the Loan and shall be secured by the Loan Instruments.  Borrower hereby authorizes Lender to hold, use, disburse, and apply the Loan and the Borrower's Deposit for payment of costs of construction of the Improvements, expenses incident to the Loan and the Property, and the payment or performance of any obligation of Borrower hereunder or under any of the other Loan Instruments.  Borrower hereby assigns and pledges the proceeds of the Loan and the Borrower's Deposit to Lender for such purposes.  Lender may advance and incur such expenses

as Improvements and to preserve the Property and any other security for the Loan, and such expenses, even though in excess of the amount of the Loan, shall be secured by the Loan Instruments and payable to Lender. Lender may disburse any portion of any Advance at any time, and from time to time, to persons other than Borrower for the purposes specified in this Section 4.11 irrespective of the provisions of Section 2.3 hereof, and the amount of Advances to which Borrower shall thereafter be entitled shall be correspondingly reduced.

4.12    Costs and Expenses.  Borrower shall pay when due all costs and expenses required by this Loan Agreement, including, without limitation, (a) all taxes and assessments applicable to the Property, (b) all fees for filing or recording the Loan Instruments, (c) all fees and commissions lawfully due to brokers, salesmen, and agents in connection with the Loan, or the Property, (d) all fees and expenses of counsel to Lender, (d) all title insurance and title examination charges, including premiums for the Title Insurance, (f) all survey costs and expenses, including the cost of the Survey, (g) all premiums for the Insurance Policies, and (h) all other costs and expenses payable to third parties incurred by Lender in connection with consummation of the transactions contemplated by this Loan Agreement.

4.13    Additional Documents.  Borrower shall execute and deliver to Lender, from time to time as requested by Lender, such other documents as shall reasonably be necessary to provide the rights and remedies to Lender granted or provided for by the Loan Instruments.

4.14    Inspection of Books and Records.  Borrower shall permit Lender, at all reasonable times, to examine and copy the books and records of Borrower pertaining to the Loan and the Property, and all contracts, statements, invoices, bills, and claims for labor, materials, and services supplied for the construction of the Improvements.

4.15    No Liability of Lender.  Lender and Lender's Inspecting Architects/Engineers shall have no liability, obligation, or responsibility whatsoever with respect to the construction of the Improvements except to advance the Loan and the Borrower's Deposit pursuant to this Loan Agreement. Further, the Inspecting Architects/Engineers shall have no liability, obligation, or responsibility whatsoever to Borrower with respect to the construction of the Improvements. Lender shall not be obligated to inspect the Property or the construction of the Improvements, or be liable or responsible for any defect in the Property or the Improvements by reason of inspecting same, nor be liable for the performance or default of Borrower, Architect, the Inspecting Architects/Engineers, Contractor, or any other party, or for any failure to construct, complete, protect, or insure the Improvements, or for the payment of costs of labor, materials, or services supplied for the construction of the Improvements, or for the performance of any obligation of Borrower whatsoever. Nothing, including without limitation any Advance or acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any party by Lender.

4.16    No Conditional Sale Contracts, Etc.  No materials, equipment, or fixture shall be supplied, purchased, or installed for the construction or operation of the Improvements pursuant to security agreements, conditional sale contracts, lease agreements, or other arrangements or understandings whereby a security interest or title is retained by any party or the right is reserved or accrues to any party to remove or repossess any materials, equipment, or fixtures intended to be utilized in the construction or operation of the Improvements.

Construction Loan Agreement - Page 15

4.17   Defense of Action.  Lender may (but shall not be obligated to) commence, appear in, or defend any action or proceeding purporting to affect the Loan, the Property, or the respective rights and obligations of Lender and Borrower pursuant to this Loan Agreement. Lender may (but shall not be obligated to) pay all necessary expenses, including attorneys' fees and expenses incurred in connection with such proceedings or actions, which Borrower agrees to repay to Lender.

4.18   Assignment of Construction Contract.  As additional security for the payment of the Loan, Borrower hereby transfers and assigns to Lender all of Borrower's rights and interest, but not its obligations, in, under and to the Construction Contract, upon the following terms and conditions:

(a)   Borrower represents and warrants that the copy of any Construction Contract it has furnished to Lender is a true and complete copy thereof and that Borrower's interest therein is not subject to any claim, setoff, or encumbrance.

(b)   Neither this assignment nor any action by Lender shall constitute an assumption by Lender of any obligation under the Construction Contract, and Borrower shall continue to be liable for all obligations of Borrower thereunder, Borrower hereby agreeing to perform all of its obligations under the Construction Contract.  Borrower indemnifies and holds Lender harmless against and from any loss, costs, liability, or expense (including, but not limited to, attorneys' fees and expenses resulting from any failure of Borrower to so perform.

(c)   Lender shall have the right at any time (but shall have no obligation) to take in its name or in the name of Borrower such action as a Lender may at any time determine to be necessary or advisable to cure any default under the Construction Contract or to protect the rights of Borrower or Lender thereunder.  Lender shall incur no liability if any action so taken by it or in its behalf shall prove to be inadequate or invalid, and Borrower agrees to hold Lender free and harmless against and from any loss, cost, liability or expense (including, but not limited to, attorneys' fees and expenses) incurred in connection with any such action.

(d)   Borrower hereby irrevocably constitutes and appoints Lender as Borrower's attorney-in-fact, in Borrower's name or in Lender's name, to enforce all rights of Borrower under the Construction Contract.

(e)   Prior to an Event of Default, Borrower shall have the right to exercise its rights as Owner under the Construction Contract, provided that Borrower shall not cancel or amend the Construction Contract or do or suffer to be done any act which would impair the security constitute by this assignment without the prior written consent of Lender.

(f)   This assignment shall inure to the benefit of Lender, its successors and assigns, including any purchaser upon foreclosure of the Mortgage, any receiver in possession of the Property, and any corporation formed by or on behalf of Lender which assumes Lender's rights and obligations under this Loan Agreement.

4.19 <u>Assignment of Plans.</u> As additional security for the payment of the Loan, Borrower hereby transfers and assigns to Lender all of Borrower's right, title and interest in and to the Architectural Contract and Plans and hereby represents and warrants to and agrees with Lender as follows:

(a) The schedule of the Plans delivered to Lender is a complete and accurate description of the Plans.

(b) The Plans are complete and adequate for the construction of the Improvements and there have been no modifications thereof except as described in such schedule. The Plans shall not be modified without the prior written consent of Lender.

(c) Lender may use the Plans for any purpose relating to the Improvements, including but not limited to inspections of construction and the completion of the Improvements.

(d) Lender's acceptance of this assignment shall not constitute approval of the Plans by Lender. Lender has no liability or obligation whatsoever in connection with the Plans and no responsibility for the adequacy thereof or for the construction of the Improvements contemplated by the Plans. Lender has no duty to inspect the Improvements, and, if Lender should inspect the Improvements, Lender shall have no liability or obligation to Borrower arising out of such inspection. No such inspection nor any failure by Lender to make objections after any such inspection shall constitute a representation by Lender that the Improvements are in accordance with the Plans or constitute a waiver of Lender's right thereafter to insist that the Improvements be constructed in accordance with the Plans.

(e) This assignment shall inure to the benefit of Lender, its successors and assigns, including any purchaser upon foreclosure of the Mortgage, any receiver in possession of the Property, and any corporation formed by or on behalf of Lender which assumed Lender's rights and obligations under this Loan Agreement.

4.20 <u>Prohibition on Assignment of Borrower's Interest.</u> Borrower shall not assign or encumber any interest of Borrower in the Property or other assets of Borrower without the prior written consent of Lender.

4.21 <u>Payment of Claims.</u> Borrower shall promptly pay or cause to be paid when due all costs and expenses incurred in connection with the Property and the construction of the Improvements, and Borrower shall keep the Property free and clear of any lien, charge, or claim other than the encumbrances of the Mortgage and other liens approved in writing by Lender. Notwithstanding anything to the contrary contained in this Loan Agreement, Borrower (a) may contest the validity or amount of any claim of any contractor, consultant, architect, or other person providing labor, materials, or services with respect to the Property, (b) may contest any tax or special assessments levied by any Governmental Authority, and (c) may contest the enforcement of or compliance with any Governmental Requirements, and such contest on the part of Borrower shall not be a default hereunder and shall not release Lender from its obligations to make Advances hereunder; provided, however, that during the pendency of any

such contest Borrower shall furnish to Lender and Title Company an indemnity bond with a corporate surety satisfactory to Lender and Title Company or other security acceptable to them in an amount equal to the amount being contested plus a reasonable additional sum to cover possible costs, interest, and penalties, and provided further that Borrower shall pay any amount adjudged by a court of competent jurisdiction to be due, with all costs, interest, and penalties thereon, before such judgment becomes a lien on the Property.

4.22 <u>Restrictions and Annexation</u>. Borrower shall not impose any restrictive covenants, easements or other encumbrances upon the Property, execute or file any subdivision plat affecting the Property, or consent to the annexation of the Property to any city without the prior written consent of Lender.

4.23 <u>Advertising by Lender</u>. Borrower agrees that, during the term of the Loan, Lender may erect and maintain on the Property one or more advertising signs indicating that the construction financing for the Property has been provided by Lender.

4.24 <u>Current Financial Statements</u>. Borrower shall (1) on or before the fifteenth (15th) day of each month, deliver to Lender current financial statements itemizing the income and expense of the Property for the immediately preceding month, (2) on or before March 30th of each year, deliver or cause to be delivered to Lender then current Financial Statements of Borrower, and (3) from time to time, as Lender may request, deliver to Lender additional Financial Statements of Borrower.

4.25 <u>Tax Receipts</u>. Subject to the provisions of Section 4.22 hereof, Borrower shall furnish Lender with receipts or tax statements marked "Paid" to evidence the payment of all taxes levied on the Property on or before 30 days prior to the date such taxes become delinquent.

4.26 <u>Loan Participation</u>. Borrower acknowledges and agrees that Lender may, from time to time, sell or offer to sell interests in the Loan and the Loan Instruments to one or more participants. Borrower authorizes Lender to disseminate any information it has pertaining to the Loan, including, without limitation, complete and current credit information on Borrower, and any of its principals, to any such participant or prospective participant.

4.27 <u>Notice of Litigation, Claims, and Financial Change</u>. Borrower shall promptly inform Lender of (a) any litigation against Borrower or affecting the Property, which, if determined adversely, might have a material adverse effect upon the financial condition of Borrower or upon the Property, or might cause an Event of Default, (b) any claim or controversy which might become the subject of such litigation, and (c) any material adverse change in the financial condition of Borrower. For purposes hereof, a material adverse change shall be deemed to have occurred when (1) there has been a decline of ten percent (10%) or more in the tangible net worth of Borrower as shown on the Financial Statements delivered to Lender in connection with the Loan or (2) actual sources and uses of funds for any twelve-month period adversely vary by ten percent (10%) or more with the pro forma sources and uses of funds statement submitted for such period.

4.28    No Occupancy Contrary to Builder's Risk Policy. The Improvements shall not be occupied until Borrower has obtained and furnished to Lender a "permission to occupy" endorsement to the builder's risk insurance policy, which endorsement is satisfactory to Lender, or Borrower has obtained replacement coverage in the form of an all-risk insurance policy upon the completed Improvements, which policy will not be impaired by the occupancy of the Improvements and is satisfactory to Lender.

4.29    Hold Harmless. Borrower shall defend, at its own cost and expense, and hold Lender harmless from, any proceedings or claims in any way relating to the Property or the Loan Instruments. All costs and expenses incurred by Lender in protecting its interests hereunder, including all court costs and attorneys' fees and expenses, shall be borne by Borrower. The provisions of this Section shall survive the payment in full of the Loan and all other indebtedness secured by the Mortgage and the release of the Mortgage as to events occurring and causes of action arising before such payment and release.

4.30    Hazardous Materials; Indemnification.

(a)     Borrower agrees to (i) give notice to Lender immediately upon Borrower's acquiring knowledge of the presence of any Hazardous Materials on the Property or of any Hazardous Materials Contamination with a full description thereof; (ii) promptly, at Borrower's sole cost and expense, comply with any Governmental Requirements requiring the removal, treatment or disposal of such Hazardous Materials or Hazardous Materials Contamination and provide Lender with satisfactory evidence of such compliance; and (iii) provide the Lender, with thirty (30) days after demand by Lender, with a bond, letter of credit or similar financial assurance evidencing to Lender;s satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of such Hazardous Materials or Hazardous Materials Contamination and discharging any assessments which may be established on the Property as a result thereof.

(b)     Borrower shall not cause or suffer any liens to be recorded against the Property as a consequent of, or in any way related to, the presence, remediation or disposal of Hazardous Material in or about the Property, including any state, federal or local so-called "Super Fund" lien relating to such matters.

(c)     Borrower shall at all times retain any and all liabilities arising from the presence, handling, treatment, storage, transportation, removal or disposal of Hazardous Materials on the Property. Regardless of whether any Event of Default shall have occurred and be continuing or any remedies in respect of the Property are exercised by Lender, Borrower shall defend, indemnify and hold harmless Lender from any and against any and all liabilities (including strict liability), suits, actions, claims, demands, penalties, damages (including, without limitation, lost profits, consequential damages, interest, penalties, fines and monetary sanctions), losses, costs or expenses (including, without limitation, attorneys' fees and expenses, and remedial costs) (the foregoing are hereinafter collectively referred to as "Liabilities") which may now or in the future (whether before or after the culmination of the transactions contemplated by this Loan Agreement) incurred or suffered by Lender by reason of, resulting from, in connection

with, or arising in any manner whatsoever out of the breach of any warranty or covenant or the inaccuracy of any representation of Borrower contained or referred to in this Section or Section 3.7 of this Loan Agreement or which may be asserted as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission, or release from the Property of any Hazardous Materials or any Hazardous Materials Contamination or arise out of or result from the environmental condition of the Property or the applicability of any Governmental Requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Lender.

Such Liabilities shall include, without limitation: (i) injury or death to any person; (ii) damage to or loss of the use of any property; (iii) the cost of any demolition and rebuilding of the Improvements, repair or remediation and the preparation of any activity required by any Governmental Authority; (iv) any lawsuit brought or threatened, good faith settlement reached, or governmental order relating to the presence, disposal, release or threatened release of any Hazardous Material on, from or under the property; and (v) the imposition of any lien on the Property arising from the activity of Borrower or Borrower's predecessors in interest on the Property or from the existence of Hazardous Materials or Hazardous Materials Contamination upon the Property.

The covenants and agreements contained in this Section shall survive the consummation of the transactions contemplated by this Loan Agreement.

4.31    Disclaimer.  Borrower acknowledges and agrees that Lender has not made any commitments, either express or implied, to extend the term of the Loan past its stated maturity date.

## ARTICLE 5 - RIGHTS AND REMEDIES OF LENDER

5.1    Rights of Lender.  Upon the occurrence of an Event of Default, Lender shall have the right, in addition to any other right or remedy of Lender, but not the obligation, in its own name or in the name of Borrower, to enter into possession of the Property; to perform all work necessary to complete the construction of the Improvements substantially in accordance with the Plans and Governmental Requirements; and to employ watchmen and other safeguards to protect the Property.  Borrower hereby appoints Lender as the attorney-in-fact of Borrower, with full power of substitution, and in the name of Borrower, if Lender elects to do so, upon the occurrence of an Event of Default, to (a) use such sums as are necessary, including any proceeds of the Loan and the Borrower's Deposit, make such changes or corrections of the Improvements substantially in accordance with the Plans and Governmental Requirements, (b) execute all applications and certificates in the name of Borrower which may be required for completion of construction of the Improvements, (c) endorse the name of Borrower on any checks or drafts representing proceeds of the Insurance Policies, or other checks or instruments payable to Borrower with respect to the Property, (d) do every act with respect to the construction of the Improvements which Borrower may do, and (e) prosecute or defend any action or proceeding

incident to the Property. The power of attorney granted hereby is a power coupled with an interest and irrevocable. Lender shall have no obligation to undertake any of the foregoing actions, and, if Lender should do so, it shall have no liability to Borrower for the sufficiency or adequacy of any such actions taken by Lender.

5.2     Acceleration.   Upon the occurrence of an Event of Default, Lender may, at its option, declare the Loan immediately due and payable without notice of any kind (unless notice is required by applicable law).

5.3     Cessation of Advances.   Upon the occurrence of an Event of Default, the obligation of Lender to disburse the Loan and the Borrower's Deposit and all other obligations of Lender hereunder shall, at Lender's option, immediately terminate.

5.4     Funds of Lender.   Any funds of Lender used for any purpose referred to in this Article 5 shall constitute Advances secured by the Loan Instruments and shall bear interest at the rate specified in the Note to be applicable after default thereunder.

5.5     No Waiver or Exhaustion.   No waiver by Lender of any of its rights or remedies hereunder, in the other Loan Instruments, or otherwise, shall be considered a waiver of any other or subsequent right or remedy of Lender; no delay or omission in the exercise or enforcement by Lender of any rights or remedies shall ever be construed as a waiver of any right or remedy of Lender; and no exercise or enforcement of any such rights or remedies shall ever be held to exhaust any right or remedy of Lender.

## ARTICLE 6 - GENERAL TERMS AND CONDITIONS

6.1     Notices   All notices, demands, requests, approvals and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given when presented personally or deposited in a regularly maintained mail receptacle of the United States Postal Service, postage prepaid, registered or certified, return receipt requested, addressed to Borrower or Lender, as the case may be, at the respective addresses set forth on the first page of this Loan Agreement, or such other address as Borrower or Lender may from time to time designate by written notice to the other as herein required.

6.2     Entire Agreement and Modifications.   The Loan Instruments constitute the entire understanding and agreement between the undersigned with respect to the transactions arising in connection with the Loan and supersede all prior written or oral understandings and agreements between the undersigned in connection therewith.   No provision of this Loan Agreement or the other Loan Instruments may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver, or termination is sought to be enforced.

6.3     Severability.   In case any of the provisions of this Loan Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Loan Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

6.4    Election of Remedies.  Lender shall have all of the rights and remedies granted in the Loan Instruments and available at law or in equity, and these same rights and remedies shall be cumulative and may be pursued separately, successively, or concurrently against Borrower or any property covered under the Loan Instruments, at the sole discretion of Lender. The exercise or failure to exercise any of the same shall not constitute a waiver or release thereof or of any other right or remedy, and the same shall be nonexclusive.

6.5    Form and Substance.  All documents, certificates, insurance policies, and other items required under this Loan Agreement to be executed and/or delivered to Lender shall be in form and substance satisfactory to Lender.

6.6    Limitation on Interest.  All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of acceleration of the maturity of any indebtedness governed hereby or otherwise, shall the interest contracted for, charged or received by Lender exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender shall be reduced to the maximum amount permitted under applicable law; and, if from any circumstance the Lender shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be refunded to Borrower.  All interest paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full period until payment in full of the principal of the Loan (including the period of any renewal or extension thereof) so that interest thereon for such full period shall not exceed the maximum amount permitted by applicable law.  This paragraph shall control all agreements between the Borrower and Lender.

6.7    No Third Party Beneficiary.  This Loan Agreement is for the sole benefit of Lender and Borrower and is not for the benefit of any third party.

6.8    Borrower in Control.  In no event shall Lender's rights and interests under the Loan Instruments be construed to give Lender the right to, or be deemed to indicate that Lender is in control of the business, management or properties of Borrower or has power over the daily management functions and operating decisions made by Borrower.

6.9    Number and Gender.  Whenever used herein, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders. The duties, covenants, obligations, and warranties of Borrower in this Loan Agreement shall be joint and several obligations of Borrower and of each Borrower if more than one.

6.10   Captions.  The captions, headings, and arrangements used in this Loan Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

6.11   Applicable Law.  **THIS LOAN AGREEMENT AND THE LOAN INSTRUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED**

STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE. BORROWER REPRESENTS THAT (A) BORROWER APPLIED FOR THE LOAN EVIDENCED BY THE NOTE IN DALLAS, TEXAS, (B) ALL NEGOTIATIONS RELATING TO THE LOAN AND THIS LOAN AGREEMENT HAVE TAKEN PLACE IN DALLAS, TEXAS, AND (C) THE ONLY CONTACT BETWEEN THIS TRANSACTION AND THE STATE OF COLORADO IS THAT THE PROPERTY IS LOCATED IN COLORADO.

     **6.12** <u>Trial by Jury</u>. BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THIS LOAN AGREEMENT OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS.

     **6.13** <u>Jurisdiction</u>. BORROWER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF TEXAS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS LOAN AGREEMENT BY ANY MEANS ALLOWED UNDER TEXAS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING SHALL BE DALLAS COUNTY, TEXAS; PROVIDED, THAT THE LENDER MAY CHOOSE ANY VENUE IN ANY STATE WHICH IT DEEMS APPROPRIATE IN THE EXERCISE OF ITS SOLE DISCRETION.

     EXECUTED AND DELIVERED as of the date first recited.

                **LENDER:**

                PMC COMMERCIAL TRUST, a Texas real estate investment trust

                By:_____
                Name: Jan F. Salit
                Title: Executive Vice President

                **BORROWER:**

                LOUISVILLE HOSPITALITY GROUP, INC., a Colorado corporation

                By:_____
                Hitesh L. Patel, President

## EXHIBIT "A"

### Property Description

Lot 2, CENTENNIAL VALLEY, Parcel H, Second Filing, County of
Boulder, State of Colorado.

## EXHIBIT "B"

( )  1.  Construction Fee to Lender in the amount of .75% of the Construction Contract in cash;

( )  2.  Commitment Fee in the amount of $32,610.00;

( )  3.  The Note;

( )  4.  The Mortgage;

( )  5.  The Security Agreement;

( )  6.  Subordination of all leases affecting the Property;

( )  7.  The Title Insurance;

( )  8.  Insured Closing Service letter;

( )  9.  Reinsurance Agreement;

( )  10.  The fully executed Construction Contract;

( )  11.  The consent of Contractor to the assignment of the Construction Contract;

( )  12.  Subordination of mechanics' and materialmen's liens from all electrical, plumbing, mechanical, elevator and HVAC subcontractors and suppliers;

( )  13.  The Architectural Contract;

( )  14.  The Plans;

( )  15.  Consent of Architect to the assignment of the Plans and the Architectural Contract;

( )  16.  The Survey;

( )  17.  Financing Statements (Form UCC-1) with respect to the security interest granted in the Loan Instruments, together with evidence of the priority of the respective security interests perfected thereby;

( )  18.  Financial Statements;

( )  19.  Evidence of approval of the Plans by Lender, any lessee of the Property, if applicable, and any necessary Governmental Authority;

( )  20.  Building permit and all other permits required by the Governmental Requirements with respect to the construction and development of the Property;

( )  21.  Evidence of Borrower's compliance with or satisfaction of all conditions applicable to any leases affecting the Property;

Construction Loan Agreement - Exhibit "B"

( )  22.  Evidence that all applicable zoning ordinances or restrictive covenants affecting the Property permit the use for which the Property is intended and have been or will be complied with;

( )  23.  Evidence of the Property's compliance with the requirements of all applicable "environmental protection" laws, rules, and regulations, whether federal, state, or municipal;

( )  24.  Evidence that all of the streets providing access to the Property either have been dedicated to public use or established by private easement, duly recorded in the records of the County in which the Property is located, and have been fully installed and accepted by Governmental Authority, that all costs and expenses of the installation and acceptance thereof have ben paid in full, and that there are no restrictions on the use and enjoyment of such streets that adversely affect, limit, or impair Borrower's ability to develop and construct the Property or operate the Property of the purposes and in the manner represented to Lender;

( )  25.  Evidence of the availability of all utilities to the Property, entering from a public roadway or over unencumbered private easement, including specifically, but without limitation, gas, electricity, sewer, and water services;

( )  26.  Evidence that all necessary action on the part of Borrower has been taken with respect to the execution and delivery of this Loan Agreement and the consummation of the transactions contemplated hereby, so that this Loan Agreement and all Loan Instruments to be executed and delivered by or on behalf of the person or entity executing and delivering such document. Such evidence shall include, at the option of the Lender, a legal opinion of Borrower's legal counsel confirming such authority, validity, and binding effect, confirming that neither the Loan nor any of the financing arrangements contemplate by this Loan Agreement violates the usury laws of the State of Texas, or any other applicable jurisdiction, and covering such other matters as Lender may require;

( )  27.  A flood insurance policy, or binder therefor, in an amount equal to the outstanding principal Amount of the Loan or the maximum amount available under the Flood Disaster Protection Act of 1973 and regulations issued pursuant thereto (the "Act"), whichever is less, in form complying with the "insurance purchase requirements" of the Act, or evidence that no portion of the Property lies within a designated flood plain or flood hazard area;

( )  28.  The Insurance Policies or Certificates of such Insurance Policies;

( )  29.  Breakdown of all costs and expenses required to complete development and construction of the Property, in detail and in amount acceptable to Lender;

( )  30.  Performance and payment bonds, naming Lender as joint obligee, issued by a T-rated company;

( )  31.  Application for Advance;

( )  32.  Tax or assessment certificates or other similar evidences of payment from all appropriate bodies or entities which have taxing or assessing authority over any of the Property, stating that all taxes and assessments are current;

Construction Loan Agreement - Exhibit "B"

( )   33.   Either a statement by a qualified third party unrelated to Borrower or an Environmental Site Assessment by an engineer acceptable to Lender providing that there is no evidence that any Hazardous Materials have been or are being generated, treated, stored or disposed of on any of the Property and none exists on, under or at the Property;

( )   34.   Soils Report;

( )   35.   Evidence of compliance with all requirements of the Americans with Disabilities Act, together with any related state or local regulation.

( )   36.   UCC lien search and federal tax lien search with the Secretary of State of the State of Colorado indicating no UCC or federal tax lien filings against Louisville Hospitality Group, Inc., a Colorado corporation.

( )   37.   Evidence that all adjustment and corrections recommended to Lender by U. S. Encon/SBL, Inc. have been made to the Plans, and evidence of the acceptance of the same without a cost increase by Contractor.

( )   Borrower acknowledges and agrees that no disbursement, including any disbursement for reimbursement for the purchase price of the Property, shall be made until each of the foregoing is completed.

## EXHIBIT "C"

### APPROVED BUDGET

|     |                                                                                  |                              |
| --- | -------------------------------------------------------------------------------- | ---------------------------- |
| 1.  | Construction Costs in accordance with the terms of the Construction Contract     | 2,075,170.00 ~~$2,135,170.00~~ |
| 2.  | Purchase of the Property                                                         | 640,000.00                   |
|     | Lease of Furniture, Fixtures and Equipment                                       | 300,000.00                   |
| 3.  | Working Capital (closing costs and soft costs)                                   | 345,000.00                   |
|     | Total                                                                            | 3,360,170.00 ~~$3,420,170.00~~ |

Construction Loan Agreement - Exhibit "C"

# EXHIBIT "D"

| | | |
|---|---|---|
| 1. | Architect: | Habitat Architectural Group, PA. |
| 2. | Completion Date: | 240 Calendar Days. |
| 3. | Contractor(s): | Coe Construction, Inc. |
| 4. | The Improvements: | Construction of Quality Inn & Suites. |
| 5. | The Title Company: | Chicago Title Insurance Company |

6.    Retainage to be deducted from Advance: Ten Percent (10%).

7.    Frequency of Advances: At the sole discretion of Lender.

8.    The Survey Requirements:

    (a)    Field Note Description.  The Survey should contain a certified metes and bounds description and should comply with the following requirements:

        (i)    The beginning point should be established by a monument located at the beginning point, or by reference to a nearby monument;

        (ii)    The sides of the Property should be described by giving the distances and bearing of each;

        (iii)    The distances, bearings, and angles should be taken from a recent instrument survey, or recently recertified instrument survey, by a licensed Professional Engineer or Registered Surveyor;

        (iv)    Curved sides should be described by data including: length of arc, central angle, radius of circle for the arc and chord distance, and bearing;

        (v)    The legal description should be a single perimeter description of the entire Property;

        (vi)    The description should include a reference to all streets, alleys, and other rights-of-way that abut the Property surveyed, and the width of all rights-of-way mentioned should be given the first time these rights-of-way are referred to; and

        (vii)    If the Property surveyed has been recorded on a map or plat as part of an abstract or subdivision, reference to such recording data should be made.

    (b)    Lot and Block Description.  If the Property is included within a properly established, recorded subdivision or addition, then a lot and block description will be an acceptance substitute for a metes and bounds description, provided that the lot and block description must completely and properly identify the name or designation of the recorded

subdivision or addition and give the recording information therefor.

(c)     Map or Plat.  The Survey should also contain a certified map or plat showing the following:

    (i)      the plot to be covered by the Mortgagee;

    (ii)     the relation of the point of beginning of said plot to the monument from which it is fixed;

    (iii)    monuments for corners and points of curves;

    (iv)     all easements, showing recording information therefor by volume and page;

    (v)      the established building line, if any;

    (vi)     all easements appurtenant to said plot;

    (vii)    the boundary line of the street or streets abutting the plot and the width of said streets; and

    (viii)   encroachments and the extent thereof in terms of distance upon said plot or any easement appurtenant thereto.

The Survey should also contain all structures and improvements on said plot with horizontal lengths of all sides and relation thereof by distances to (a) all boundary lines of the plot, (b) easements, (c) established building lines, and (d) street lines.

(d)     Certification.  The certification for the Property description and the map or plat should be addressed to Lender (and to the interested title company, if required by the title company), signed by the surveyor, bearing current date, registration number, and seal, and should be in the following form or its substantial equivalent:

The undersigned hereby certifies to Lender that (i) this survey was made on the ground as per the field notes shown hereon and correctly shows the boundary lines and dimensions and area of the land indicated hereon and each individual parcel thereof indicated hereon; (ii) all monuments shown hereon actually exist, and the location, size and type of such monuments are correctly shown; (iii) this survey correctly shows the location of all buildings, structures, other improvements and visible items on the subject Property; (iv) this survey correctly shows the location and dimensions of all alleys, streets, roads, rights-of-way, easements, and other matters of record of which the undersigned has been advised affecting the subject Property according to the legal description in such easements and other matters (with instrument, book, and page number indicated); (v) except as shown, here are no visible easements, rights-of-way, party walls, drainage, ditches, streams, or conflicts, visible encroachments onto adjoining premises, streets or alleys by any of said buildings, structures, or other improvements on adjoining premises; (vi) the distance from the nearest intersecting street and road is as shown hereon; and (vii) the subject property has direct access to dedicated public roads accepted for maintenance by the entity to which such roads were dedicated.

9.     Standard Mortgage Clause for All-Risk Insurance Policy:

Construction Loan Agreement - Exhibit "D"

The mortgage clause to be contained in the All-Risk Insurance Policy covering the Improvements should be in the following form:

This policy, as to the interest of mortgagee only therein, shall not be invalidated by any act or neglect of mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy, provided that the mortgagee shall notify this Company of any change of ownership or increase of hazard which shall come to the knowledge of said mortgagee, and, unless permitted by this policy, it shall be noted hereon; and provided, further, that upon failure of the insured to render proof of loss, such mortgagee upon notice shall render proof of loss in the form herein specified within ninety-one (91) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit.

Failure upon the part of mortgagee to comply with any of the foregoing obligations shall render the insurance under this policy null and void as to the interest of mortgagee.

This policy may be canceled as to the interest of any mortgagee named hereon by giving such mortgagee thirty (30) days' written notice.

If the Company shall claim that no liability existed as to mortgagor or owner, it shall, to the extent of payment of loss to mortgagee, be subrogated to all mortgagee's rights to recovery, but without impairing mortgagee's right to sue; or it may pay off the mortgage debt and require an assignment thereof and of the mortgage without recourse.

The word "mortgagee" shall be construed to mean "mortgagee or trustee."

Case No. 1:17-cv-03092-MSK-SKC Document 9 filed 01/03/18 USDC Colorado pg 50 of 67

# ATTACHMENT B

T369

# PROMISSORY NOTE

**$2,174,000.00**                    **Dallas, Texas**                    _/_/_1/26_ , 1999

FOR VALUE RECEIVED, the undersigned, **LOUISVILLE HOSPITALITY GROUP, INC.**, a Colorado corporation (the "Maker"), hereby unconditionally promises to pay to the order of **PMC COMMERCIAL TRUST**, a Texas real estate investment trust (the "Lender"), at 18111 Preston Road, Suite 600, Dallas, Texas, 75252, the principal sum of Two Million One Hundred Seventy-Four Thousand and No/100 Dollars ($2,174,000.00), or so much thereof as may be advanced from time to time, in lawful money of the United States of America, together with interest on the outstanding sum initially at the rate of interest equal to the lesser of (a) the highest lawful nonusurious interest rate that at any time, or from time to time, may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by this Note under the laws of the United States or the State of Texas which are presently or hereinafter in effect (the "Maximum Rate"); or (b) the Applicable Rate (as herein defined. For purposes of this Note, the term "Applicable Rate" shall mean Nine Percent (9.00%) per annum; provided, however, in the event that the proceeds of this Note are not fully funded on or before the Completion Date (as defined in that certain Construction Loan Agreement of even date herewith executed by Maker and Lender), then Lender shall have the option, to be exercised in Lender's sole discretion, to adjust the Applicable Rate to a rate equal to the rate charged on such date by Lender for similar type loans, such determination of the new rate to be made by Lender in the exercise of Lender's sole discretion.

Interest only shall be due and payable on the first day of each month, commencing on the first day of the month following any disbursement under this Note, and continuing until and including the date which is the first day of the first month immediately succeeding the Permanent Rate Commencement Date. Commencing on the first day of the second month immediately succeeding the Permanent Rate Commencement Date, and continuing on the first day of each month thereafter, payments shall be due in an amount necessary to fully amortize the stated principal balance of this Note over a period of twenty (20) years at the interest rate in effect on this Note, such payments to continue until an including the date which is twenty (20) years from the date hereof (the "Maturity Date"), at which time the unpaid principal balance, together with all accrued and unpaid interest hereunder and all other sums due and owing by Maker to Lender, shall be due and payable. Lender shall have the right to increase or decrease the monthly installments due herein upon any change in the applicable interest rate. For purposes of this Promissory Note, the "Permanent Rate Commencement Date" shall mean the earlier of (i) the date of full funding of this Promissory Note in accordance with the terms of the Construction Loan Agreement (as defined herein), (ii) the date of issuance of the certificate of occupancy, as required in the Construction Loan Agreement, or (iii) July 27, 1999. Past due installments of principal and interest shall be subject to a late charge in the amount of five percent (5%) of each such installment, if not paid within ten (10) days of its due date. All unpaid principal, and to the extent permitted by law, all accrued but unpaid interest, due at maturity of this Note shall bear interest at the Maximum Rate, and shall be due and payable on demand. Computations of interest on the unpaid principal amount of this Note from time to time outstanding, at the rates provided in this Note, shall be made on the basis of the actual number of days elapsed. To the extent

Promissory Note - Page 1

permitted by applicable law, such interest shall be computed on the basis of a three hundred sixty-five (365) day year. In the event that Maker presents checks for the payment of the installments due herein and the same are dishonored twice, then all future installments shall be made by cashier's check.

All principal and interest payments shall be made at the Lender's offices in Dallas, Texas. All payments hereon shall be applied first to accrued interest, and the balance to principal. Maker hereof shall have the right to prepay the unpaid principal balance of this Note in whole or in part at any time prior to maturity; provided, however, in the event of a prepayment of principal of this Note in advance of the due date thereof (whether due to the acceleration of the principal balance in accordance with the terms hereof or otherwise), Maker shall pay to Lender a prepayment penalty on the date of such prepayment as liquidated damages for lost opportunity costs of Lender, equal to the lesser of (a) the maximum prepayment penalty allowed by applicable state or federal law; or (b) the greater of (i) ninety-five (95) days interest on the amount prepaid at the interest rate in effect on this Note on the date of such prepayment, or (ii) Yield Maintenance Premium (as defined herein). For purposes of this Note, the term "Yield Maintenance Premium" shall mean the result received under the following calculation: (a) the amount of any prepayment of principal under this Note in advance of the Maturity Date, multiplied by (b) the product of (i) the number of years (or fraction thereof) remaining from the date of the prepayment until the Maturity Date, and (ii) the Reinvestment Yield. For purposes of this Note, the term "Reinvestment Yield" shall mean, with respect to any prepayment of principal under this Note in advance of the due date of such payment, the difference between (i) the interest rate of this Note on the date of the prepayment, less (ii) the Prepayment Yield Rate. For purposes of this Note, the term "Prepayment Yield Rate" shall mean the sum of the yield, as of the date of the prepayment made on this Note, of U.S. Treasury Bonds and Notes maturing on the date which is five (5) years from the date of such prepayment, plus three percent (3.0%). For purposes of this Note, the yield of U.S. Treasury Bonds and Notes shall be determined by reference to the Treasury Bonds, Notes, and Bills section of the Southwest Edition of the Wall Street Journal; provided, if the Wall Street Journal discontinues publishing such yield, then such yield shall be determined by reference to any other nationally recognized source as selected by Lender. In the event that no yield is indicated for the month of the date hereof, the month of prepayment, or the month of the Maturity Date, the next succeeding month for which a yield is published shall be utilized for purposes of determining the yield of U.S. Treasury Bonds and Notes.

Payment of this Note is secured by a Deed of Trust, Assignment of Leases and Rents, and Security Agreement of even date herewith executed by Maker (the "Deed of Trust") encumbering certain property of the Maker located in Boulder County, Colorado. Reference is made to the Deed of Trust for a statement of certain obligations of the Maker, a description of the property mortgaged and assigned, a statement of the nature and extent of the security, and the rights of the parties under the Deed of Trust in respect of such security. As additional security for the payment of this Note, the Maker grants to the Lender a lien and contractual right of set-off in and to all money or securities now in, or at any time hereafter coming within, the custody or control of the Lender. Any documents now or hereafter evidencing, securing, guaranteeing or executed in connection with the indebtedness evidenced by this Note are, as the same may be amended from time to time, herein referred

Promissory Note - Page 2

to collectively as the "Loan Documents" and individually as a "Loan Document."· All of the
property, rights and interests which from time to time constitute security for the payment of
this Note are referred to together herein as the "Property."

At the option of the Lender, the entire principal balance and accrued interest owing
hereon shall at once become due and payable without notice or demand (except as otherwise
expressly provided herein) upon the occurrence at any time of any of the following events
(an "Event of Default"):

    (a)    default in the payment of any installment of principal and/or interest due
hereunder;

    (b)    default under the Deed of Trust, the Construction Loan Agreement or any of
the Loan Documents or any other agreement securing this Note or evidencing
the loan evidenced hereby, and the failure to cure the same within ten days
of notice of the same from Lender to Maker;

    (c)    the bankruptcy or insolvency of the Maker; the assignment for the benefit of
creditors by the Maker; or the appointment of a receiver for all or any portion
of the Property; or

    (d)    the sale, encumbrance or other transfer of the Property without the prior
written consent of Lender.

Notwithstanding anything contained herein to the contrary, upon the occurrence of
an Event of Default, at the option of the Lender, the principal balance of this Note then
outstanding shall bear interest for the period beginning with the date of occurrence of such
Event of Default at the lesser of (a) eighteen percent (18.00%); or (b) the Maximum Rate.

Any notice, request, demand, instruction or other communication to be given either
party hereunder shall be in writing and shall be deemed to be sufficiently given or served
for all purposes if in writing and personally delivered or when deposited in the U.S. Mail
by certified mail, return receipt requested, postage and registration charges prepaid, as to
the following addresses:

    If to Lender:    PMC Capital, Inc.
    18111 Preston Road, Suite 600
    Dallas, Texas 75252
    Attention: Mr. Lance B. Rosemore

    With a copy to:    Thomas J. Irons, Esq.
    18333 Preston Road, Suite 410, LB 27
    Dallas, Texas 75252

    If to Maker:    Louisville Hospitality Group, Inc.
    960 W. Dillon Road
    Louisville, Colorado 80027

The addresses and addressees for the purpose of this Note may be changed by giving notice of such change in the manner provided herein for giving notice. Unless and until such written notice is received, the last address and addressee stated herein shall be deemed to continue in effect for all purposes.

If any payment of principal or interest on this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State of Texas, or on any other day on which banking institutions are authorized or obligated by law to close in the City of Dallas, State of Texas, such payment shall be made on the next succeeding business day, and such extensions of time shall in such case be included in computing interest in connection with such payment.

Regardless of any provision contained in this Note, no holder of this Note shall ever be entitled to receive, collect or apply, as interest on any amount owing hereunder, any amount in excess of the maximum rate of interest permitted to be charged by applicable law. In the event any holder of this Note ever receives, collects or applies, as interest, any such excess, such amount which would be excessive interest, shall be deemed a partial prepayment of principal and treated hereunder as such; and, if the principal amount of this Note is paid in full, any remaining excess shall forthwith be paid to Maker. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum lawful rate, the Bank and any holder of this Note shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment as an expense, fee or premium rather than as interest; and, (ii) amortize, prorate, allocate and spread, in equal parts, the total amount of interest throughout the entire contemplated term of this Note. In the event the interest received for the actual period of existence hereof exceeds the maximum lawful rate, the holder of this Note shall refund Maker the amount of such excess or credit against the principal amount hereof, and in such event, no holder of this Note shall be subject to any penalties provided in any laws for contracting for, charging for, or receiving interest in excess of the maximum lawful rate.

If this Note is placed in the hands of an attorney for collection or if it is collected through any legal proceeding at law or in equity or in bankruptcy, receivership or other court proceeding, Maker agrees to pay all costs of collection, including, but not limited to, court costs and reasonable attorney's fees.

Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

If more than one person or entity executes this Note as Maker, all of said parties shall be jointly and severally liable for the repayment of the indebtedness evidenced hereby. Maker and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (i) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notice, filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (ii) agree to any substitute,

subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (iii) agree that the Lender shall not be required first to institute suit or exhaust its remedies hereon against Maker or others liable or to become liable hereon or to enforce its rights against them or any security herefor; and (iv) consent to any extension or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice hereof to any of them.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE. MAKER REPRESENTS THAT (A) MAKER APPLIED FOR THE LOAN EVIDENCED BY THE NOTE IN DALLAS, TEXAS, (B) ALL NEGOTIATIONS RELATING TO THE LOAN AND THIS NOTE HAVE TAKEN PLACE IN DALLAS, TEXAS, AND (C) THE ONLY CONTACT BETWEEN THIS TRANSACTION AND THE STATE OF COLORADO IS THAT THE PROPERTY IS LOCATED IN COLORADO.

MAKER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THIS NOTE OR THE ACTS OR FAILURE TO ACT OF OR BY LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS NOTE OR THE OTHER LOAN DOCUMENTS.

MAKER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF TEXAS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE OBLIGATION(S) BY ANY MEANS ALLOWED UNDER TEXAS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING MAY BE DALLAS COUNTY, TEXAS; PROVIDED, THAT LENDER MAY CHOOSE ANY VENUE IN ANY STATE WHICH IT DEEMS APPROPRIATE IN THE EXERCISE OF ITS SOLE DISCRETION.

[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Executed as of the date first set forth above.

**MAKER:**

LOUISVILLE HOSPITALITY GROUP, INC.,
a Colorado corporation

By: _____
   Hitesh L. Patel, President

Attest: _____
   Dipak N. Patel, Secretary

# ATTACHMENT C

PMC Commercial Trust
17950 Preston Road Suite 600
Dallas, Texas 75252

!!IMPORTANT!!
PLEASE RESPOND WITHIN TEN (10) DAYS

Mr. Hitesh Patel
Best Western Plus
960 West Dillon Road
Louisville, CO 80027

Re:     Loan #R185

To Whom It May Concern:

Our auditors PricewaterhouseCoopers, L.L.P. are in the process of performing an audit of our financial statements. As part of their audit process, they randomly select some of our loan accounts to confirm the accuracy of our financial records. On the following page is a schedule of activity for your account during the twelve months ended December 31, 2012. Please examine the information below and indicate whether the balance is correct in the space provided. If you have any discrepancies, please provide our auditors with the detail necessary to resolve the discrepancies.

|  | Balance |
|---|---|
| Unpaid Balance as of 12/31/12 | $1,398,962.83 |
| Unpaid Escrow Balance of 12/31/12 | $0 |
| Reasons for discrepancies: | |

_____
_____
_____
_____

Please mail your reply with the attached schedule directly to PricewaterhouseCoopers, L.L.P., Attn: Kristin Millington at 2001 Ross Avenue, Suite 1800, Dallas, Texas 75201. A self addressed stamped envelope is enclosed for your convenience. Thank you.

Very truly yours,

Barry N. Berlin, CPA
Chief Financial Officer

The information shown above with respect to our loan balance is correct as of December 31, 2012, and discrepancies, if any, have been provided to assist you in reconciling the differences.

_____         _____
Signature                                              Date

Case 1:17-cv-03092   Document 1-4   Filed 12/21/17   USDC Colorado   Page 1 of 3

# ATTACHMENT D



17950 PRESTON ROAD, SUITE 600
DALLAS, TEXAS 75252
PHONE: (972) 349-3200
FAX: (972) 349-3265
TOLL FREE: (800) 486-3223

January 10, 2013

*Via Federal Express*
Louisville Hospitality Group, Inc.
Attn: Hitesh L. Patel, President
960 W. Dillon Road
Louisville, Colorado 80027

Re:    R185; Best Western, Louisville, CO

Dear Mr. Patel:

This is to follow up on our recent telephone conversation about this loan. Through an internal audit, we discovered that the monthly payments of $19,560.04 are too low to fully amortize the balance of the loan over the twenty-year term of the note. **This is not a notice of default.** The purpose of this letter is to explain the situation and offer several options to address it.

The promissory note requires monthly payments "in an amount necessary to fully amortize the stated principal balance of this Note over a period of twenty (20) years at the interest rate in effect on this Note, such payments to continue until and including the date which is twenty (20) years from the date hereof (the 'Maturity Date'), at which time the unpaid principal balance, together with all accrued and unpaid interest hereunder and all other sums due and owing by Maker to Lender, shall be due and payable." The interest rate in effect on the Note is 9.50 percent per year. The current Maturity Date is January 20, 2019. A regular monthly payment amount of *$20,404.99* would have been needed from the Permanent Rate Commencement Date, which was September 17, 1999, to fully amortize the balance over the term of the note.

We can address the shortfall in the past monthly payments by modifying the loan in one of the following ways, depending upon which would work best for you. To avoid possible confusion or complaints by the guarantors, we will need them to approve the modification.

Option 1. Keep the same monthly payment amount of $19,560.04, keep the same maturity date of January 20, 2019, and have a balloon payment due at maturity. According to our preliminary calculations, a balloon payment of $563,901.68 would be due on the current maturity date of January 20, 2019 with monthly payments of $19,560.04, assuming all future monthly payments are made on time and no defaults occur.

Option 2. Keep the same monthly payment amount of $19,560.04 and extend the maturity date to fully amortize the loan balance with that monthly payment amount. According to our preliminary calculations, the maturity date would have to be extended to October 1, 2021 to fully amortize the loan balance with monthly payments of $19,560.04, assuming all future monthly payments are made on time and no defaults occur.

Option 3. Keep the same maturity date of January 20, 2019 and increase the monthly payments to fully amortize the loan balance by that date. According to our preliminary calculations, the monthly payment amount would have to be increased to $25,497.86 starting February 1, 2013 to fully amortize the loan balance by the current maturity date of January 20, 2019, assuming all future monthly payments are made on time and no defaults occur.

---

### NATIONAL LENDING PROGRAMS

SMALL BUSINESS ADMINISTRATION                                    LONG TERM CONVENTIONAL
504 AND 7(A) PROGRAM BUSINESS LOANS                              COMMERCIAL LOANS

Case No. 1:17-cv-03092-MSK-SKC   Document 12   Filed 05/02/18   USDC Colorado   Page 3 of 3
Case 1:17-cv-03092-MSK-SKC   Document 1   Document 12/21/17   USDC Colorado   Page 3 of 3
61 of 67

Option 4. Keep the same maturity date of January 20, 2019, increase the monthly payments to *$20,404.99*, and have a one-time payment to reduce the loan balance to the amount needed to fully amortize the balance by the current maturity date of January 20, 2019 at that monthly payment amount. According to our preliminary calculations, a one-time payment of $295,905.00 would have to be made on January 1, 2013 to fully amortize the loan balance by the current maturity date of January 20, 2019 with monthly payments of *$20,404.99* starting January 1, 2013, assuming all future monthly payments are made on time and no defaults occur.

An agreement to modify the loan according to any of these options is enclosed along with a pre-paid FedEx return package. We will need original "wet" signatures by the borrower and all guarantors.

If you have any questions or if you would like to discuss this further, please contact me at your earliest convenience.

Sincerely,

Tom Cantrell,
Senior Portfolio Manager

Enclosure

4810-4415-4642, v. 1

---

| SMALL BUSINESS ADMINISTRATION | LONG TERM CONVENTIONAL |
| 504 AND 7(A) PROGRAM BUSINESS LOANS | COMMERCIAL LOANS |

# ATTACHMENT E

# Snell & Wilmer
L.L.P.
LAW OFFICES

Tabor Center
1200 Seventeenth Street
Suite 1900
Denver, Colorado 80202-5854
303.634.2000
303.634.2020 (Fax)
www.swlaw.com

DENVER
LAS VEGAS
LOS ANGELES
LOS CABOS
ORANGE COUNTY
PHOENIX
RENO
SALT LAKE CITY
TUCSON

Brian P. Gaffney
(303) 634-2077
bgaffney@swlaw.com

April 25, 2017

**VIA EMAIL & U.S. MAIL**

Meshach Y. Rhoades
Armstrong Teasdale LLP
435 South Ulster Street
Suite 800
Denver, Colorado 80237
mrhoades@armstrongteasdale.com

> *Re:* ***Louisville Hospitality Group, Inc.***

Dear Meshach:

As you are aware, we have been retained by ReadyCap Commercial LLC, servicer for Sutherland Asset I, LLC ("Lender"), successor to PMC Commercial Trust ("PMC"). I am writing to follow up on our previous conversation regarding the outstanding loan between Louisville Hospitality Group, Inc. ("Borrower") and Lender evidenced by that certain written Promissory Note dated January 20, 1999 in the original principal amount of $2,174,000 (the "Note") and secured by that certain real property commonly known as 960 W. Dillon Road, Louisville, Colorado 80027.

As we discussed, several years ago, PMC realized that under the current amortization schedule the monthly payments being made by Borrower were not sufficient to pay the Note in full by maturity and resulting in Borrower being required to pay a substantial balloon payment to satisfy the Note. The primary reason for the amortization shortfall and the increased amount of the balloon payment is because, as permitted pursuant to the terms and conditions of the Note, PMC increased the applicable interest rate on the Note to 9.5% per annum, but did not adjust the monthly payment amount upward to account for the increased monthly interest accrual. The increase in the interest rate was expressly authorized by the Note because the loan was not fully funded on or before the Completion Date (as defined in the Construction Loan Agreement).

4843-9071-5462.2

Snell & Wilmer
——— L.L.P. ———

Meshach Y. Rhoades
April 25, 2017
Page 2

While Borrower claims that it was not made aware of the interest rate change, Borrower acknowledged in writing to PMC that the interest rate on the Note was, in fact, 9.5% per annum in a letter dated September 28, 2011 to PMC. The 2011 letter from Borrower to PMC predates PMC's realization that the monthly payments were not sufficient to fully pay the loan by maturity.

We would also like to highlight that the Note was never set to fully amortize (with or without the interest rate change) and that a balloon payment was always intended. As provided in the second paragraph of the Note, interest only payments were due on the Note beginning after the first disbursement until the Permanent Rate Commencement Date (as defined in the Note). Borrower did not begin making payments of principal and interest based on the 20 year amortization schedule until one month after the Permanent Rate Commencement Date, which was well into the first year after the Note had been executed and disbursements had begun. The maturity date, however, was set for 20 years following the date of the Note. As such, there was always a gap between the 20 year maturity date and the 20 year amortization schedule due to the date upon which payments of principal and interest were required to start. Furthermore, the Note provides that at maturity "the unpaid principal balance, together with all accrued and unpaid interest hereunder and all other sums due and owing by Maker to Lender, shall be due and payable." Accordingly, the Note always contemplated some form of a balloon payment. Due to the increase in the interest rate, however, the amount of the balloon payment has substantially increased over what was initially contemplated.

The Note is currently set to mature on January 20, 2019, at which time there will be due a balloon payment of $541,927.84. In order to avoid unnecessary and costly litigation down the road, Lender is willing to offer Borrower a 32 month extension of the loan in order to allow the Note to fully amortize and to avoid the balloon payment at maturity. Borrower's monthly payment during the extension would be decreased from $19,560.04 to $19,402.31. The extension and reduction in the monthly loan payment is in lieu of Lender increasing the monthly loan payment in order to fully amortize the loan by the existing maturity date or requiring Borrower to make the final balloon payment. The new maturity date would be August 20, 2021. Enclosed for your convenience is a new amortization schedule reflecting the payments during the extension.

4843-9071-5462.2

Snell & Wilmer
———— L.L.P. ————

Meshach Y. Rhoades
April 25, 2017
Page 3

Please let us know whether Borrower accepts extension offer and we will prepare drafts of the documents or if you would like to discuss further. We look forward to your response or counteroffer.

Very truly yours,

Snell & Wilmer

Brian P. Gaffney

BPG:sb

Enclosure

cc:     Client (via email)

4843-9071-5462.2

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Louisville Hospitality Group, Inc. | Sutherland Asset I, LLC -and- KeyCorp |

| (b) County of Residence of First Listed Plaintiff **Boulder County** | County of Residence of First Listed Defendant **New Castle County** |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Meshach Y. Rhoades, Armstrong Teasdale, 4643 South Ulster Street, Suite 800, Denver, Colorado 80237, (720) 722-7196 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 2201 - 2202.
Brief description of cause:
Declaratory Judgment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 541,927.84

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 12/21/17

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 06/17)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 **(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 **(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.